978 A.2d 852

**Herbert LIVINGSTONE, et al.**

v.

**GREATER WASHINGTON ANESTHESIOLOGY
& PAIN CONSULTANTS, P.C., et. al.**

**No. 2079, Sept. Term, 2007.**

Court of Special Appeals of Maryland.

Aug. 27, 2009.

348

350

Barry J. Nace (Christopher T. Nace, Paulson & Nace on the brief), Washington D.C., for appellant.

Michael E. von Diezelski & Benjamin S. Vaughan (Adelman, Sheff & Smith, LLC on the brief, of Annapolis), and (Kenneth Armstrong, Armstrong, Donohue, Ceppos & Vaughan, Chtd. on the brief, of Rockville), for appellee.

Panel: HOLLANDER, MATRICCIANI, GRAEFF, JJ.

GRAEFF, J.

This matter arises from a wrongful death action filed by appellants, Herbert Livingstone, individually and as administrator and personal representative of the estate of his deceased wife, Tracy Orr ("Dr.Orr"), who died on November 12, 2002, three days after giving birth to twin boys by a pre-term Cesarean section.[1] The complaint alleged medical negligence by appellees Richard S. Margolis, M.D. and Stephen D. Martin, M.D. in their care and treatment of Dr. Orr in the days just prior to and during the delivery of the twins.[2]

After an eight day trial, the Honorable Terrence J. McGann presiding, the jury returned a verdict in favor of appellees. The jury found that neither Dr. Margolis nor Dr. Martin committed a breach of the standard of care when providing treatment to Dr. Orr. Accordingly, the circuit court entered judgment in favor of appellees.

Appellants appealed and present five questions for our review, which we have rephrased slightly:

---

[1] Tracy Orr was not a medical doctor; she had a Ph.D.

[2] The appellees in this case include: Dr. Margolis; his professional association, Capital Women's Care, L.L.C.; Dr. Martin; his professional association, Greater Washington Anesthesia and Pain Consultants, P.C. ("Greater Washington Anesthesia"); and Adventist Healthcare, Inc., d/b/a Shady Grove Adventist Hospital, based on a theory of apparent agency because it was the entity that contracted with Dr. Martin. The complaint also listed Edward J. Wolfgram, M.D. as a defendant, but the claims against him were dismissed with prejudice on August 3, 2007.

1. Did the trial court fail to properly instruct the jury on causation?

2. Did the trial court err in admitting evidence regarding an "amniotic fluid embolism?"

3. Did the trial court err in excluding evidence regarding Dr. Martin's handling of the "Code?"

4. Did the trial court err in denying appellants' request to add an additional expert witness two months after the deadline for designating expert witnesses, but prior to the commencement of discovery regarding experts?

5. Did the trial court err in permitting the jury to begin deliberations at approximately 7:00 p.m. on a Friday evening after two weeks of evidence in a medical malpractice trial?

Appellees Dr. Martin and Greater Washington Anesthesiology filed a cross-appeal, which presents one issue:

Did the trial court err by failing to grant appellees' motion to dismiss because plaintiffs' Certificates of Merit failed to attest to a departure from the standards of care that proximately caused the decedent's death?

For the reasons that follow, we shall affirm the judgment of the circuit court. Accordingly, we will not address the issue raised by appellees in their cross appeal.

### Factual And Procedural Background

On November 6, 2002, Dr. Orr was admitted to Shady Grove Adventist Hospital. Dr. Orr was 43 years old and approximately 27 weeks pregnant with twins. She had preeclampsia [3] and gestational diabetes, and she was experiencing pre-term labor. On November 9, 2002, her membranes ruptured (her "water broke"). Upon the recommendation of her physicians, Dr. Orr consented to and underwent a Cesarean section attended by, among others, Dr. Margolis, an obstetrician, and

---

[3]. Dr. Joseph Ernest testified that preeclampsia is a condition wherein a pregnant woman has elevated blood pressure and an abnormal amount of protein in her urine.

Dr. Martin, an anesthesiologist. The delivery of the first twin occurred at approximately 6:54 p.m., and the second twin was delivered at about 6:56 p.m. Very soon after the second twin's delivery, it was noted that Dr. Orr was unresponsive and subsequently in cardiac arrest. A "code" was called by the nurses present, and resuscitative measures were undertaken.[4] Unfortunately, Dr. Orr suffered brain injury. On November 11, 2002, life support was withdrawn, and on November 12, 2002, Dr. Orr died. The twins survived.

On November 4, 2005, nearly three years after Dr. Orr's death, appellants filed a claim with the Health Care Alternative Dispute Resolution Office of Maryland ("HCADRO"), in accordance with the Health Care Malpractice Claims statute, Md.Code (2002), §§ 3–2A–01 to –10 of the Courts & Judicial Proceedings Article ("CJP"). In their claim, appellants alleged that appellees failed to adhere to the required standards of care in their treatment of Dr. Orr, and that those failures were the proximate cause of her death. Specifically, the appellants alleged that the appellees "failed to adhere to the required standard of care" by their "failure to properly and carefully: 1. assess and monitor [Dr.] Orr's condition prior to surgery, 2. treat [Dr.] Orr prior to surgery, and 3. monitor [Dr.] Orr's progress during her cesarean section surgery ..."

Pursuant to CJP § 3–2A–04(b), a claim filed with the HCADRO must include a certificate of qualified expert attesting that the health care provider departed from standards of care and that such departure was the proximate cause of the alleged injury. In this case, appellants filed two certificates. The first certificate was by Kris Sperry, M.D., a Board Certified Pathologist, who stated:

It is my opinion that [Dr.] Orr died due to irreversible brain damage and associated failure of other organ systems, all of

---

4. A "code" is defined as a "[t]erm used in hospitals to describe an emergency requiring situation-trained members of the staff ... or the signal to summon such a team." STEDMAN'S MEDICAL DICTIONARY 404 (28th ed.2006). In their brief, appellants define "code" as "the time during which resuscitation efforts were undertaken to revive Dr. Orr."

which were caused by hypoxia and severe acidosis. It is also my opinion that she did not sustain an amniotic fluid embolus during the cesarean section she underwent to deliver her twin sons, and that an amniotic fluid embolus played no role in causing the hypoxia and acidosis that culminated in her death.

The second certificate of merit was by Dr. Stephanie Mann, a Board Certified Obstetrician–Gynecologist. Dr. Mann stated:

It is my opinion from reviewing [Dr. Orr's] records that the Health Care Providers, each of them, violated the standard of care.... It is my belief that these physicians violated the appropriate standard of care in numerous ways, including failing to recognize the pulmonary problem that [Dr. Orr] was suffering from and not treating her appropriately under the circumstances.

Dr. Mann's certificate did not attest that any breach of the standard of care caused Ms. Orr's death.

On May 7, 2007, the HCADRO Director issued an Order finding that appellants had satisfied the requirements of § 3–32A–01 by filing a valid Certificate of Qualified Expert and an appropriate accompanying report. It further ordered that the certificates of merit were "sufficiently detailed such that they are recognized by this Body as appropriate Reports of Attesting Experts."

Appellants subsequently filed a complaint in the circuit court under the Wrongful Death Act of Maryland, Md.Code (2002), CJP §§ 3–901–904. In their complaint, appellants alleged that Dr. Margolis and Dr. Martin failed to properly and carefully: "1. Assess and monitor [Dr.] Orr's condition prior to surgery"; "2. Treat [Dr.] Orr prior to surgery"; and "3. Monitor [Dr.] Orr's progress during her cesarean section surgery."

On May 22, 2006, the circuit court issued a Scheduling Order, which required, among other things, that appellants identify their expert witnesses by November 8, 2006. On that date, appellants filed their "expert witness designation," which

named the following three liability experts: Stephanie Mann, M.D., "offered as an expert in the area of obstetrics and gynecology, standard of care, causation, and damages"; Jeffrey Cocozzo, M.D., "offered as an expert in the area of [anesthesiology], standard of care, causation, and damages"; [5] and Kris Sperry, M.D., "offered as an expert in the area of forensics, causation, and damages."

On January 19, 2007, appellants filed a "Motion for Leave to Add Expert Witness," seeking permission to add a second anesthesiologist. The circuit court denied appellants' motion, as well as appellants' Motion for Reconsideration.

On February 15, 2007, appellees filed a motion to dismiss on the grounds that the Certificates of Qualified Expert filed by Dr. Mann and Dr. Sperry were deficient in that they failed to attest that appellees violated the standard of care in their treatment of Dr. Orr and that any such violations were the proximate cause of Dr. Orr's death. The circuit court denied this motion.

Appellees filed a motion *in limine* to exclude any evidence or testimony by appellant's expert, Dr. Cocozzo, that Dr. Martin violated the standard of care in handling the code to resuscitate Dr. Orr. Appellees argued that the claims alleged against Dr. Martin involved his conduct prior to the calling of the code, and that no expert had opined that Dr. Martin had violated the standard of care in his handling of the code or that the handling of the code caused Dr. Orr's death. Subsequent to the filing of this motion, and less than two weeks before the scheduled trial date, Dr. Cocozzo filed an errata sheet that purported to clarify some of his deposition testimony related to this issue. As discussed in more detail, *infra*, the trial court granted appellees' motion to strike the errata sheet filed by Dr. Cocozzo, and it granted appellees' motion *in limine*.

---

**5.** Appellants note in their brief that Dr. Cocozzo was incorrectly identified as an expert in the fields of Obstetrics and Gynecology, but Dr. Cocozzo's curriculum vitae made clear that he was an expert in anesthesiology.

The trial began on September 4, 2007. In their appellate brief, appellants summarize the evidence they presented as follows:

Mr. Livingstone claimed that on November 6, 2002 (three days prior to her admission to the delivery room) Tracy Orr had developed pulmonary edema in addition to pre-eclampsia and gestational diabetes. Pulmonary edema is a life threatening condition and in this case was not recognized as such and was not properly treated by Appellees Drs. Margolis and Martin. Mr. Livingstone alleged at trial that the Appellees' failure to properly treat Dr. Orr's pulmonary edema was a substantial factor of her death.

Mr. Livingstone also alleged that upon Dr. Orr's admission to the delivery room with a severely compromised respiratory system the Appellees did not properly monitor Tracy Orr, such that she developed an even worse respiratory condition eventually resulting in a respiratory arrest. This respiratory arrest, according to Mr. Livingstone, led to a cardiac arrest in the operating room during the delivery of Dillon and Ryan Livingstone. Both the respiratory and cardiac arrests were neither timely nor properly treated as required by the applicable standards of care, and these negligent acts by the Appellees were substantial factors to the subsequent death of Tracy Orr.

Appellants' statement of facts provides no record references regarding where such facts can be found. Our review of the record extract provided by the parties has revealed little testimony from appellants' experts regarding any violation of the standard of care. And appellants have not provided the complete transcript of the trial in the record on appeal. *See* Md. Rule 8–411(a)(1) (appellant's responsibility to order the transcript "of (A) all the testimony or (B) that part of the testimony that the parties agree, by written stipulation filed with the clerk of the lower court, is necessary for the appeal").

A review of the limited record before us, including closing

argument of counsel,[6] indicates that appellants' argument at trial regarding Dr. Margolis was that he failed to follow the requisite standard of care by failing to properly treat Dr. Orr's pulmonary edema prior to delivery, and he failed to get an arterial blood gas to determine why her oxygen levels were not higher. With regard to Dr. Martin, it appears that appellants alleged that he violated the standard of care by conducting an inferior "presurgery anesthesia assessment" and by failing to timely recognize, in the midst of surgery, that Dr. Orr was not getting enough oxygen. At oral argument before this Court, when pressed to identify specifically how appellees breached the standard of care, appellants' counsel responded that both Dr. Margolis and Dr. Martin (1) failed to recognize timely the pulmonary problem Dr. Orr was experiencing, and (2) failed to "give her more oxygen." [7]

The record extract is sparse with respect to testimony from appellees' witnesses regarding the standard of care. As discussed, *infra*, however, a review of the appellees' closing argument indicates that there was extensive direct and cross-examination on this issue, and appellees vigorously argued that neither doctor breached the standard of care in their care and treatment of Dr. Orr.

Appellees also presented extensive evidence regarding the cause of Dr. Orr's death. Appellees presented expert testimony that Dr. Orr died from an amniotic fluid embolism ("AFE"), an unpredictable "obstetrical catastrophe" befalling a pregnant woman. Dr. Gary Hankins was accepted as an expert in the area of obstetrics, gynecology and amniotic fluid embolism. Dr. Hankins testified that, in his opinion, after the

---

6. The transcript of the closing arguments was submitted after oral argument, pursuant to this Court's request.

7. With respect to appellants' assertion in their statement of facts that "[b]oth the respiratory and cardiac arrests were neither timely nor properly treated as required by the applicable standards of care," and their assertion in oral argument that "the code was not properly taken care of," the record on appeal reflects that no evidence was presented in support of this contention. The trial court's exclusion of evidence in this regard is challenged on appeal, as discussed *infra*.

second baby's amniotic sac ruptured, amniotic fluid entered Dr. Orr's circulation through the incision of the uterus, which was made to perform the Cesarean section. The amniotic fluid entered Dr. Orr's circulation in the uterus at approximately 6:55 p.m., and it caused "her oxygenation to plummet." Without an exchange of oxygen, she became hypoxic. The lack of oxygen caused Dr. Orr's uterus to turn from pink to blue, and it caused her to lose consciousness. Dr. Hankins testified that the process was accelerated in Dr. Orr because she had preexisting pulmonary issues.

Dr. Hankins explained that "vasoactive compounds," such as the prostaglandins, in the amniotic fluid "cause blood vessels to squeeze down ... constrict." The constriction of the blood vessels results in changes in the pressure gradient between blood flow and air flow in the air sacs where gas exchange is taking place, a process called shunting. The shunting process results in de-oxygenated blood returning to the heart from the lungs, rather than oxygen rich blood. As a result, de-oxygenated blood is then pumped to the tissues of the rest of the body. As the body reacts to oxygen deprivation, organs in the body shut down.

Dr. Hankins noted that the evidence showed that Dr. Orr's uterus changed color within 15 to 30 seconds. He explained that "something really drastic and catastrophic happened to [Dr. Orr] in a really short window of time." In his opinion, the evidence showed that Dr. Orr suffered an AFE.

Dr. James Pepple, an anesthesiologist at Sinai Hospital in Baltimore, Maryland, testified that, in his opinion, to a reasonable degree of medical probability, Dr. Orr suffered an AFE, and, as a consequence, she had a "sudden cardiac arrest with change in blood pressure, change in color to require resuscitation and to require intubation and CPR [Cardiopulmonary Resuscitation]." He further testified that an AFE is "very unpredictable" and "unpreventable."

Dr. Joseph Ernest, an obstetrician, testified that Dr. Orr had "a very common presentation" of AFE, including a "very dramatic respiratory event." He explained that, when amniot-

ic fluid gets into the maternal blood, "[i]ts almost as if [the woman] . . . has a significant allergic or anaphylactic reaction to some component that's on the fetal cells." That results in "a very dramatic change in her oxygen level in her blood," which has "very profound effects." He noted that was what happened with Dr. Orr; "her vital signs dramatically changed."

Dr. Ernest explained the process as a constriction of the blood vessels in the lungs, so no matter how much oxygen the woman is given, there is "no blood flowing through the lungs to pick [the oxygen] up and take it to the body." That affects the brain and the heart. Ultimately, the patient suffers from disseminated intravascular coagulation ("DIC"), where blood vessels in the body dilate and "get very leaky." [8] He testified that the events that occurred in this case during the delivery of the babies "were so sudden and so catastrophic and so fit the picture of an amniotic fluid embolus." In particular, Dr. Ernest noted that the testimony that Dr. Orr's uterus was pink at the time of delivery of the first baby, but had turned blue two minutes later with the delivery of the second baby, was consistent with an AFE.

Dr. Bruce Goldman, a pathologist, reviewed a photomicrograph of a slide of lung tissue from Dr. Orr.[9] Dr. Goldman concluded that "fetal cells derived from amniotic fluid" were circulating in Dr. Orr's blood.

At the conclusion of the eight-day trial, the jury was provided with a special verdict sheet, which required a specific finding as to each defendant on the issues of negligence, causation and damages. The jury rendered a verdict in favor of appellees, finding that neither Dr. Margolis nor Dr. Martin had violated the standard of care. As such, the jury did not reach the issues of causation and damages.

---

**8.** Dr. Hankins testified that Dr. Orr suffered from DIC.

**9.** Dr. Goldman did not see the actual slide because the Medical Examiner's office would not release it.

Additional facts will be set forth as necessary in the discussion of the individual issues presented.

## DISCUSSION

### I.

### Jury Instructions On Causation

Appellants' first contention is that the trial court erred in instructing the jury with regard to causation. The trial court instructed the jury that, if it found "that the doctor's conduct was a violation of the duty of care owed to the patient," it must determine, "by a preponderance of the evidence, whether this failure has been shown to a reasonable medical probability to have caused Tracy Orr's death." The court then gave the following instruction on the issue of causation:

Causation: for the plaintiff to recover damages, the defendant's negligence must be a cause of the plaintiff's injury. There may be more than one cause of an injury; that is, several negligent acts may work together. Each person whose negligent act is a cause of an injury is responsible.

You are instructed that the plaintiffs need only prove the most likely cause of Tracy Orr's death. The plaintiffs are not required to negate or exclude every other possible cause.

However, if there are two or more causes, either of which could have resulted in Tracy Orr's death, one of which[,] for which[,] the defendant is responsible, and the others for which the defendant is not, then the plaintiffs have to prove, by evidence more likely so than not, that the acts for which the defendant is responsible, in fact, caused the death.

Likewise, the evidence must not leave the causal connection a matter of conjecture. The evidence must be something more than consistent with the plaintiffs' theory as to how the death occurred.

Where proof of causal connection is equally balanced, or the facts are as consistent with one theory as another, the

plaintiffs have not met the burden which the law casts upon them.

If the evidence shows that an injury may have resulted from one of several causes, but only one of the causes can be attributed to the defendant's negligence, the plaintiffs' claim must fail.

Appellants contend that the trial court's instruction was erroneous for two reasons: (1) it failed to instruct the jury that causation could be established through the substantial factor test; and (2) although the first paragraph of the instruction advised that appellants needed to prove that appellees' negligence was *a* cause of Dr. Orr's death, the remainder of the instruction misstated the law and "elevated the burden upon Mr. Livingstone to prove *the* cause of Tracy Orr's death."

Appellees advance three arguments why the court's instruction does not require reversal of the judgment below. First, they argue that, because appellants did not object to the causation instruction promptly after jury instructions were given, the issue has not been preserved for appellate review. Second, they contend that the jury instruction was proper. They note that the first paragraph of the jury instruction defining causation was taken directly from the Maryland Civil Pattern Jury Instructions ("MPJI").[10] Appellees further point out that the Wrongful Death Act, CJP § 3–902, states that "an action may be maintained against a person whose wrongful act causes the death of another." Based on this language, they argue that the "substantial factor" test is not a proper causation instruction in a Wrongful Death action, and the instruction given by the trial court was proper pursuant to Maryland law.

---

**10.** *Maryland Pattern Jury Instructions,* MPJI–Cv 19.10 (2003) provides: "For the plaintiff to recover damages, the defendant's negligence must be a cause of the plaintiff's injury. [There may be more than one cause of an injury, that is, several negligent acts may work together. Each person whose negligent act is a cause of an injury is responsible.]"

Third, appellees argue that, even if the instruction was error, it was harmless error. Appellees point to the special verdict sheet, which shows that the jury found that appellees did not violate the standard of care in treating Dr. Orr, and therefore, it did not reach the question of causation. Under these circumstances, they argue, any error in the instruction regarding causation is now moot.

■ Starting first with the preservation argument, which appellees set forth in a footnote, the record reflects that, after the court instructed the jury, it asked both counsel if they had any "additions, corrections or anything that needs to be put on the record." Appellants' counsel responded: "No, your Honor." Under these circumstances, where appellants did not object to the causation instruction after the court instructed the jury, appellees contend that the issue is not preserved for appellate review.

To be sure, Maryland Rule 2–520(e) requires that objections to the court's instructions be made by a party "on the record promptly after the court instructs the jury." This Court, however, has noted that there are exceptions to this rule:

[U]nder certain well-defined circumstances, when the objection is clearly made before instructions are given, and restating the objection after the instructions would obviously be a futile or useless act, we will excuse the absence of literal compliance with the requirements of the Rule. We make clear, however, that these occasions represent rare exceptions and that the requirements of the Rule should be followed closely.

*Haney v. Gregory,* 177 Md.App. 504, 518, 936 A.2d 388 (2007) (citations omitted).

Here, appellants made clear prior to the court's instructions to the jury that they objected to the causation instructions that the court planned to give. On the last day of trial, prior to the court's instructions to the jury, there was an extended discussion regarding the proposed causation instruction. Counsel clearly stated his objection to the court's decision not to instruct regarding the substantial factor test. The trial

court stated that appellant's counsel's objection was "duly noted," and that counsel could put something else on the record but it was "not a debating contest." Under these circumstances, any further objection at the conclusion of the instructions regarding the failure to instruct on the substantial factor test would have been a futile or useless act. Accordingly, we find that appellants have preserved this issue for appellate review.

■ With respect to appellants' second argument on appeal, appellants contend that, not only did the court fail to instruct on the substantial factor test, but the actual instructions given were misleading. Although appellants take no exception to the first paragraph of the instructions on causation, they argue that the second through sixth paragraphs are incorrect statements of the law because they state that appellants needed to show *the* cause, rather than *a* cause, of Dr. Orr's death. We did not find this argument raised in the discussion with the court prior to jury instructions. Other than the argument regarding the substantial factor test, counsel's sole objection was to the fourth and fifth paragraphs, and counsel's argument was that they addressed the burden of proof rather than causation. Counsel did not suggest, as he does on appeal, that any portion of the proposed instructions were incorrect statements of law, but rather, he argued that they did not belong with the instructions on causation.

The record indicates that there was an earlier discussion in chambers and that appellants had submitted a written memorandum, but there is no transcript of the discussion in chambers and we do not have in the record the written memorandum submitted. We have not found anything in the record to show that the argument raised on appeal, that the instruction improperly stated that appellants must show that appellees' negligence was *the* cause of Dr. Orr's death, was raised in the trial court. Accordingly, this argument is not preserved for our review. *See Fearnow v. Chesapeake & Potomac Tel. Co.,* 342 Md. 363, 378, 676 A.2d 65 (1996) (rule requires party to be precise in stating objections to jury instructions, to inform

judge of the exact nature and grounds of the objection); *Williams v. State*, 131 Md.App. 1, 13–14, 748 A.2d 1 (where "counsel did not bring to the court's attention the portion of the instructions which he thought" were inadequate, appellate complaint not properly before the Court) (citing *Bowman v. State*, 337 Md. 65, 69, 650 A.2d 954 (1994)), *cert. denied*, 359 Md. 335, 753 A.2d 1032 (2000).

 Thus, we will confine our review to the trial court's refusal to give an instruction regarding the substantial factor test as it relates to causation. The proper standard of review is as follows:

To rule upon the propriety of denying the requested jury instruction, a reviewing court must determine whether the requested instruction was a correct exposition of the law, whether that law was applicable in light of the evidence before the jury, and finally whether the substance of the requested instruction was fairly covered by the instruction actually given.

*Landon v. Zorn*, 389 Md. 206, 224, 884 A.2d 142 (2005) (quoting *Wegad v. Howard St. Jewelers*, 326 Md. 409, 414, 605 A.2d 123 (1992)). "The burden of showing reversible error and prejudice rests with the complaining party." *Id.* at 255, 605 A.2d 123 (citing *Farley v. Allstate Ins. Co.*, 355 Md. 34, 47, 733 A.2d 1014 (1999)). An appellate court can affirm a trial court's decision not to give an instruction, even if it was error to do so, if the appellant cannot show prejudice due to the failure to give the instruction. *Id.* at 227, 884 A.2d 142.

In the *Landon* case, Mr. Landon sued Dr. Zorn, contending that she failed to diagnose that he was suffering from necrotizing faciitis, or flesh eating bacteria, and, as a result of the failure to diagnose his condition, Mr. Landon's right leg had to be amputated. *Id.* at 211, 884 A.2d 142. Dr. Zorn, however, had requested that Mr. Landon undergo additional testing, including a CAT scan, but Mr. Landon refused, and he was discharged against medical advice. *Id.* at 212–13, 884 A.2d 142. Mr. Landon argued that he was never advised of any potential risks involved if he refused the CAT scan. *Id.* at

228, 884 A.2d 142. He requested that the court include, in its instruction on contributory negligence, an instruction that a plaintiff cannot be found guilty of contributory negligence if he is not made aware by the physician of the consequences of his actions. *Id.* at 226, 884 A.2d 142.

The Court of Appeals stated that Mr. Landon, as the complaining party, had the burden to show both error and prejudice. *Id.* at 227, 884 A.2d 142. The Court stated: "[A]ssuming *arguendo*, that the special instruction was a correct statement of the law, we would still affirm the trial court's decision because the Landons can show no prejudice by the failure of the court to give the requested instruction." *Id.* The Court explained:

In the present case, the jury was presented with a special verdict sheet. The first question on the verdict sheet stated:

1. Do you find the Plaintiffs have proven by a preponderance of evidence that Dr. Zorn breached the standard of the care of a reasonably competent emergency medicine physician?

The jury answered "No" to the question. The verdict sheet instructed the jury that if the answer the first question was "No," they were to go no further. Consequently the jury did not reach any of the remaining questions, including the one regarding contributory negligence. The Landons, therefore, can show no prejudice as a result of the court's denial to give the requested instruction. The trial court's decision not to give the requested instruction is affirmed.

*Id.* at 227–28, 884 A.2d 142.

■ The analysis in *Landon* is applicable in this case. Here, as in *Landon*, the jury was presented with a special verdict sheet. The verdict sheet set forth, in part, questions for the jury as follows:

1. (A) Do you find that Richard Margolis, M.D., committed a breach in the standard of care when providing care to Tracy Orr on November 9, 2002?

Yes ____ No ____

[If yes proceed to 1(B) if no skip to question 2]

(B) Do you find that the standard of care breach by Richard Margolis, M.D. was a proximate cause of Tracy Orr's death?

Yes ____ No ____

2. (A) Do you find that Stephen Martin, M.D., committed a breach in the standard of care when providing care to Tracy Orr on November 9, 2002?

Yes ____ No ____

[If yes proceed to 2(B) if no proceed to question 3 on the following page if you answered yes to 1(B)]

(B) Do you find that the standard of care breach by Stephen Martin, M.D. was a proximate cause of Tracy Orr's death?

Yes ____ No ____

[If yes proceed to 2(C) on the following page, if no to BOTH 1(B) and 2(B) then STOP, if yes to 1(A) and/or 1(B) then proceed to question 3 on the following page]

The jury here answered "no" to questions 1(A) and 2(A), *i.e.*, they found that neither Dr. Margolis nor Dr. Martin committed a breach in the standard of care when providing care to Dr. Orr. Thus, the jury did not proceed to determine the question of causation. Accordingly, similar to *Landon*, appellants cannot show prejudice as a result of the trial court's refusal to give their requested "substantial factor" instruction when giving its instructions on causation.

Appellants, however, argue:

The appellees' theory of the case was that an amniotic fluid embolism was the cause of Tracy Orr's death, and, importantly, that this "cause" of death was evidence that disputed the Appellants' theory of negligence. Simply put, if the jury were to believe that an amniotic fluid embolism was a cause of Tracy Orr's death, then the jury may not have even entertained evidence related to negligence and may have instead determined that an AFE was responsible for Tracy Orr's death. In that case, the Appellants could be preju-

diced even though the jury did not reach the causation question on the special verdict form because they would not have even considered the question of negligence.

We have carefully reviewed the record here, and it does not support appellants' argument. The jury was clearly advised that it had to decide two separate issues: (1) the issue whether the doctors breached the standard of care; and (2) if the answer to the first question was yes, and only in that instance, the issue whether the breach of the standard of care caused Dr. Orr's injuries. Not only did the special verdict sheet clearly set out this two step process, defense counsel also appropriately separated the issue of the standard of care and the issue of causation in their closing arguments to the jury. It was made abundantly clear to the jury that the jury had to determine whether there was a violation of the standard of care before it addressed the issue of causation.

For example, counsel for Dr. Margolis explained in his closing argument that the first issue for the jury was whether Dr. Margolis committed a breach in the standard of care. If the answer was no, "that's your verdict." Counsel explained that the jury needed to decide the issue of causation only if he was not able to persuade the jury on the standard of care issue. And counsel spent the majority of his time arguing that appellants had not provided any evidence that Dr. Margolis was negligent in his care of Dr. Orr. Counsel for Dr. Margolis concluded his argument by stating: "I ask you not to go past question 1A [involving whether there was a violation of the standard of care] because .... [u]nder the evidence, [this is] a compelling case to find that [Dr. Margolis] did not breach a standard of care and [what he did] was appropriate."

Similarly, counsel for Dr. Martin spent a significant amount of his closing argument on the issue of standard of care. Counsel argued that, contrary to appellants' claims, the evidence showed that Dr. Martin "conducted a perfectly appropriate anesthesia assessment," and that Dr. Orr's oxygen saturation levels remained at levels at which appellants' expert agreed there would not be a violation of the standard of care.

Counsel pointed to the testimony of appellants' expert, Dr. Cocozzo, that if Dr. Orr's oxygen saturation levels were kept above 90, then there was no violation of the standard of care. He further pointed to Dr. Cocozzo's testimony that a pink uterus indicated that oxygen saturation levels had not fallen below that level. Counsel then pointed to the evidence at trial that Dr. Orr's uterus was pink until the time when the second twin was delivered, when the uterus turned blue. Counsel argued: "[I]f the uterus and blood is pink up to 6:56, Dr. Martin didn't do anything wrong and [appellants'] theory that she suffered a cardiac arrest because she wasn't getting enough oxygen is out the window." Counsel further argued that the evidence showed that the babies were not deprived of oxygen, which further indicated that Dr. Orr was properly oxygenated.

Counsel for Dr. Martin concluded his argument in the same way as did counsel for Dr. Margolis, by referring to the standard of care. Counsel's last words to the jury were as follows: "When you get to the question that says, 'Did Dr. Martin violate the standard of care?' I ask you to write, 'No, he did not.' Mark the box for no. He deserves that."

Counsel for Shady Grove Adventist Hospital referenced the closing argument of counsel for Dr. Martin regarding why the evidence did not show that Dr. Martin was negligent, and he stated that he would not repeat this argument. He spent much of his time on the issue of causation, but he clearly advised the jury that there were two separate issues: (1) whether there was a violation of the standard of care; and (2) whether a violation of the standard of care was a cause of the death of Dr. Orr.[11]

The record does not support appellants' suggestion that the jury "may not have even entertained evidence related to

---

11. Counsel also referenced appellants' counsel's statement in closing argument that "we have the right to expect better things in Montgomery County," stating "[t]hat is not how we work in a court of law." Counsel urged the jury to "base your verdict upon the evidence and only the evidence."

negligence and may have instead determined that an AFE was responsible for Dr. Orr's death." The central component of the doctors' defense was that appellants had not shown that they violated the standard of care. The jury clearly found on the verdict sheet, in accordance with the extensive argument by appellees, that neither doctor violated the standard of care. In compliance with the instructions on the verdict sheet, as well as the closing argument, the jury did not reach the issue of causation. As such, appellants cannot show prejudice based on the court's instruction on causation. Accordingly, even if the causation instruction was erroneous, there would be no ground to reverse the jury's verdict.

## II.

### Exclusion of AFE Testimony & Evidence

On August 31, 2007, four days prior to the start of trial, appellants filed a motion *in limine* seeking to exclude any reference, argument, or evidence related to AFE. On the day trial was scheduled to begin, after hearing argument from counsel, the trial court denied the motion. Appellants contend that this ruling was erroneous.

During the hearing on the motion *in limine*, counsel for appellants argued that AFE is "a defense mechanism that's been made up" when doctors made a mistake and are trying to "get out of it." At trial, however, all of appellants' experts agreed that AFE was an appropriate diagnosis in the appropriate case.[12] Accordingly, appellants have not pursued their argument that AFE is not a valid diagnosis, and they limit their appellate complaint to the argument that there was "no factual predicate upon which the Appellees' experts could link their testimony in *this* case," *i.e.*, "that an AFE occurred and killed Dr. Orr." Accordingly, they argue that the expert testimony on this point should have been excluded.

---

12. Indeed, appellants' expert, Dr. Kris Sperry, the Chief Medical Examiner for the State of Georgia, testified that AFE is one of the top causes of death for women going through labor and delivery.

Appellees set forth three responses to this argument. First, they argue that "the jury's verdict in favor of the appellees on the issue of standard of care rendered moot all issues concerning the admission of evidence regarding amniotic fluid embolism as the cause of the decedent's death." Second, they contend that appellants failed to preserve their objection to the introduction of AFE evidence by failing to object when the evidence was introduced at trial. Third, appellees maintain that their experts' opinions on AFE were supported by a sufficient factual basis, and therefore, the trial court made no error in denying appellants' motion *in limine*.

We will address first the preservation argument. In their briefs filed in this Court, appellants did not deny that they failed to object when the subject of AFE was introduced at trial. Rather, they argued that an objection was not necessary, stating:

If a party cannot appeal from a court's order denying an *in limine* motion, then there is no reason to file an *in limine* motion with the trial court, and instead, objections should simply be heard at the time of trial. This defeats the purpose of an *in limine* motion, which assists in creating an orderly trial practice.

Appellants have not referred us to any case that supports this argument.[13]

Maryland case law is clear regarding the procedure required to preserve for appellate review a ruling excluding evidence based on a motion *in limine*. In order for a party to

---

**13.** Although not argued in their brief, at oral argument appellants' counsel suggested that they did object to the admission of evidence of AFE at trial. Counsel referred to a portion of the record extract where, after Dr. Hankins testified, without objection, that an AFE had occurred here, appellants' counsel objected to a question about what happened when "baby B's" amniotic fluid entered Dr. Orr's circulation. The court sustained the objection to the question "as phrased." When the question was rephrased, and Dr. Hankins gave his opinion that the second twin's amniotic fluid entered Dr. Orr's circulation at around 6:55 p.m., no objection was made. Appellants' contention, made for the first time at oral argument, that they did object to evidence of AFE when it was admitted is belied by the record.

preserve a ruling on a motion *in limine* which seeks to exclude the admission of evidence at trial, the party challenging the admission must object at the time the evidence is actually offered. *Reed v. State,* 353 Md. 628, 637, 728 A.2d 195 (1999). *Accord Ditto v. Stoneberger,* 145 Md.App. 469, 481, 805 A.2d 1148 (2002) ("A denial of a motion *in limine* to exclude evidence ... does not preserve an evidentiary issue for appeal. Rather, the party who made the motion to exclude evidence must make a contemporaneous objection at the time the evidence is introduced at trial.")

Indeed, this case illustrates why an objection at trial was necessary. The trial judge ruled that he was denying the motion *in limine* "at this point," stating: "what I'm hearing, there's only one reason to believe, number one, that it's a legitimate, recognized condition." The court stated that "maybe there will be a battle of the experts as to whether or not it is. And that's going to be a jury decision." In its ruling, however, the court stated that there was another issue, *i.e.,* "is there evidence that this woman had that condition? That's something that a jury is going to have to decide if, in fact, they have qualified expert or experts, they lay a foundation and they give that opinion." Thus, the court made clear that appellees' experts were still required to lay a sufficient factual foundation for their opinions that an AFE occurred in this case. Appellants never objected at trial, however, that the experts should not be permitted to testify because they did not have a sufficient factual basis for their opinion. Under these circumstances, appellants have failed to preserve this issue for appeal.

■ Even if we were to consider the issue on its merit s, we would find no basis for reversal. Initially, as set forth in the facts, *supra,* Dr. Hankins and Dr. Ernest described the factual basis for their opinion that Dr. Orr suffered an AFE. This testimony satisfied the requirement of Md. Rule 5–702 that there be a "sufficient factual basis" to support the expert testimony.

█ Moreover, as set forth in the brief for Dr. Margolis, Capital Women's Care, and Adventist Healthcare, Md. Rule 5–103 provides that "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling." Here, as set forth in argument one, the jury never reached the issue of causation. Thus, even if the issue was preserved, and even if the evidence of AFE was admitted improperly, appellants could not show prejudice with regard to the admission of this evidence regarding causation.

## III.

### Exclusion of Evidence Regarding Dr. Martin's Handling of the Code

█ Appellants' third claim of error is based on the circuit court's ruling excluding testimony from appellants' expert, Jeffrey Cocozzo, M.D., that Dr. Martin "was negligent in his handling of the 'code,' which refers to the time during which resuscitation efforts were undertaken to revive Dr. Orr." Appellants contend that Dr. Cocozzo disclosed such an opinion in his deposition, and the trial court erred in finding to the contrary and in excluding his testimony on that issue.

Appellees, not surprisingly, argue that the trial court properly granted their motion *in limine* to exclude this evidence. They contend that criticism of Dr. Martin's handling of the code was not raised by appellants in their claim filed with HCADRO, in their complaint filed with the circuit court, or in the depositions of appellants' experts, Dr. Mann, Dr. Sperry or Dr. Cocozzo. Rather, appellees assert that appellants focused their allegations on the care and treatment of Dr. Orr prior to and during the Cesarean section up until the point of Dr. Orr's arrest, at which time the code was called. They argue that Dr. Cocozzo never testified in his deposition that Dr. Martin violated the standard of care in his care and treatment of Dr. Orr after the arrest and during the running of the code. Appellees assert that, had the trial court allowed Dr. Cocozzo's testimony criticizing Dr. Martin's care and treatment of Dr. Orr post-arrest, it would have "constituted

precisely the sort of unfair surprise which the discovery process was intended to avoid."

Appellants do not dispute that, prior to Dr. Cocozzo's deposition, no expert had opined that Dr. Martin violated the standard of care in his care and treatment of Dr. Orr after the arrest and during the running of the code. They contend, however, that Dr. Cocozzo set forth in his deposition the theory that "Dr. Martin failed to timely and properly administer certain medications and this failure was a proximate cause of a hypoxic episode that ultimately culminated in severe brain damage leading to Dr. Orr's subsequent death."

Thus, to resolve this issue, we look to Dr. Cocozzo's deposition, which was taken on July 19, 2007, less than two months before the start of trial. During his deposition, Dr. Cocozzo, an anesthesiologist, testified that Dr. Martin breached the standard of care in treating Dr. Orr as follows:

> [M]y opinions as far as below standard of care would be the fact that there wasn't any preop anesthesia order. Sorry, any preop anesthesia record. There was no—and the anesthesiologist appears to have been basically not really aware or not really vigilant as far as about her deteriorating or the severity of her condition, you know, during the procedure which led to her respiratory arrest.

Dr. Cocozzo suggested that if Dr. Orr had been given more oxygen prior to crashing at around 6:56 p.m., she would not have suffered an acute respiratory arrest. Dr. Cocozzo opined that Dr. Martin violated the standard of care in the minutes before Dr. Orr arrested by failing to recognize a decline in her respiratory function that led to her cardiac arrest and by failing to take steps to avert the arrest. In response to questioning by counsel for Dr. Martin, Dr. Cocozzo testified:

Q: Would you agree with me that if there was no deterioration in her respiratory status *prior* to arrest, that Dr. Martin did not deviate from standards of care?

A: **That's correct.**

(Emphasis added). Up to this point, Dr. Cocozzo had not given any opinion critical of Dr. Martin's actions after Dr. Orr suffered cardiac arrest.

Near the close of the examination, the following occurred:

[COUNSEL FOR DR. MARTIN]: Okay. Have we now discussed all of the criticisms you have of Dr. Martin's care?

[DR. COCOZZO]: Yeah, I think we have.

[COUNSEL FOR DR. MARTIN]: Do you have any other opinions in any way that Dr. Martin breached the standard of care in any other fashion that we haven't already talked about?

[DR. COCOZZO]: Just hold on one second. At this time, no.

Counsel for appellants then examined Dr. Cocozzo, over objection, about the appropriate time to start medication or narcotics on a patient who is suffering a respiratory arrest. Dr. Cocozzo stated that "obviously giving the drugs as soon as possible is the best. So if you have a code, within, you know, one, two, three minutes, obviously is—is preferential to start giving the emergency medications." When asked, however, whether it was a violation of the standard of care to "fall outside" of that range of time, Dr. Cocozzo did not answer in the affirmative. Rather he stated that "its hard to put an actual time limit on starting medications, but you certainly want to start them as quickly as you can." Dr. Cocozzo did not testify that Dr. Martin violated the standard of care in his actions after Dr. Orr's arrest, nor did he testify that these actions caused Dr. Orr's death.

On August 23, 2007, approximately five weeks after Dr. Cocozzo's deposition and less than 2 weeks prior to trial, Dr. Martin and Greater Washington Anesthesia filed a motion *in limine* seeking to exclude any evidence or testimony that Dr. Martin breached the standard of care in his resuscitation efforts or the management of the code. Appellees asserted that the motion should be granted because none of appellants experts, including Dr. Cocozzo, had opined in deposition testimony or otherwise that the resuscitation efforts or code were

mishandled or that anyone had deviated from the standards of care during the resuscitation and code. Appellees further asserted that no one had opined that any alleged mishandling of the resuscitation efforts and code contributed to or caused Dr. Orr's death.

On August 24, 2007, one day after appellees' motion *in limine* was filed, appellees received a fax of a document entitled "Errata sheet," which was submitted by Dr. Cocozzo, and which purported to clarify his deposition testimony. In particular, Dr. Cocozzo changed his answer to this question by counsel for Dr. Martin:

> Do you have any other opinions in any way that Dr. Martin breached the standard of care in any other fashion that we haven't already talked about?

In the deposition, Dr. Cocozzo answered the question: "At this time, no." In the errata sheet, he changed the answer to:

> Yes I do. Dr. Martin had a serious delay in responding to the arrest with medications. It was approximately 7–8 mins. from the arrest till the first dose of epinephrine was given and approximately 9–10 mins before the first dose of atropine was given.

Appellees filed a motion to strike Dr. Cocozzo's errata sheet for several reasons. First, they argued that the errata sheet did not comply with the rule permitting changes to a transcript of a deposition.[14] Second, they argued that this errata sheet constituted a "new opinion on the eve of trial that will entirely change the focus of the allegations from events before the delivery to events after the delivery." They stated that the new opinion should be excluded

> because this extremely late designation has deprived these defendants of the opportunity to discover the basis and

---

14. Maryland Rule 2–415(d) provides, in part:

> Within 30 days after the date the officer mails or otherwise submits the transcript to the deponent, the deponent shall (1) sign the transcript and (2) note any changes to the form or substance of the testimony in the transcript on a separate correction sheet, stating the reason why each change is being made.

grounds for this new opinion and prepare an effective cross-examination. With trial starting in just several days, there is simply no time available to properly re-depose Dr. Cocozzo, understand the basis of his new opinions, communicate this information to this party's experts and client, allow Defendants' experts and client to educate this counsel on these new issues, and allow for a thoughtful response to this new and conveniently raised opinion. Importantly, the new opinion on the "errata" sheet does not state the basis or provide a summary of the grounds for the new opinion, as required by Scheduling Order, defendants' Interrogatories and Maryland [R]ules. In short, this new opinion constitutes nothing less than trial by ambush and should not be sanctioned.

Finally, they alleged that the new opinion should be excluded because the opinion is irrelevant and inadmissible unless Plaintiff offers expert testimony establishing a causal link between the alleged standard of care deviation and [Dr.] Orr's death. No where in Dr. Cocozzo's "errata" sheet or his original deposition does Dr. Cocozzo opine that, more likely than not, had the resuscitative drugs been administered earlier that [Dr.] Orr's tragic death would have been avoided. Without this essential piece of evidence, Dr. Cocozzo's conveniently new found opinion is neither relevant nor admissible.

On August 31, 2007, four days prior to the start of trial, the court held a hearing on the motion *in limine* and the motion to strike the errata sheet. After hearing argument, the court granted the motions, stating as follows:

I'm going to grant that motion. I think it's clear, if you look at Dr. Cocozzo's deposition, he does not address at any time a breach of a standard of care after the plaintiff went into arrest. Even with the prodding of [appellees'] counsel, he still was, well, you know, uh—uh—bobbing and weaving saying it should be as soon as possible. He never once said there is a particular time of which you have to give the meds, the sooner the better. And, furthermore, your doctor, he's the plaintiffs' doctor, had all of the documentation,

all of the records long, months, maybe years before this deposition, and he clearly was on notice of when these medications were given. He was clearly on notice that he was being called upon to talk and discuss about any violation of a breach of standard by Dr. Martin. He had every opportunity. In fact, [appellees' counsel] went through each period of time in the whole sequence to ask him, up until this point are all the indications that [Dr. Orr's] okay? Up until this point, up until—I mean, he went over very thoroughly. He had every opportunity. This is July 19, 2007, that's pretty much the eve of a medical malpractice case. Let's face it, we're not talking about putting together a little fender bender. And then to get to the errata sheet, I'm not going [to] even rule that it's late. But if isn't late, it's darn close. It's on the last possible day. It's not signed, the rule requires it. The reason that he's changing his opinion or adding an opinion is not indicated, which the rule requires. Those are violations, those are specific violations. They don't give the Court discretion by themselves. It would be unfair to the defense at this time to have the defense come in and offer a theory on damages and on liability of what happens because the meds were given late. And I've read all of the depositions, and it's completely blind sided by this. And so I'll grant the motion.

Our review of the record is in accord with that of the trial court. We reject appellants' assertion that the "the issue of whether the Code was handled appropriately was an issue in this case from the moment that Dr. Martin was deposed. There was no surprise to any party that this was an issue." Dr. Cocozzo's errata sheet did not, as appellants' argue, clarify Dr. Cocozzo's opinion. Rather, as appellees assert, the errata sheet was in direct contradiction to his original testimony, upon which appellees had prepared their defense. As the trial court found, it would have been unfair to the defense to allow appellants to adduce evidence of this new theory of negligence in this medical malpractice case when it was not disclosed until several days before trial.

After oral argument, appellants alerted this Court to the subsequent decision of *Marcantonio v. Moen*, 406 Md. 395, 959 A.2d 764 (2008). In that medical malpractice case, the plaintiff alleged that the medical providers "negligently failed to diagnose and treat [the plaintiff's] endometrial and ovarian cancer...." *Id.* at 399, 959 A.2d 764. After their depositions, the plaintiff's experts submitted affidavits "confirm[ing]" their opinions regarding the cause of the plaintiff's death. *Id.* at 400, 959 A.2d 764. The circuit court struck the affidavits on the ground that they materially contradicted the experts' deposition testimony in violation of Maryland Rule 2–501(e). *Id.* at 402, 959 A.2d 764. Maryland Rule 2–501(e)(1) provides that a party may file a motion to strike an affidavit or other statement under oath if it contradicts a prior sworn statement of that person making the affidavit. Maryland Rule 2–501(e)(2) provides:

> (2) If the court finds that the affidavit or other statement under oath materially contradicts the prior sworn statement, the court shall strike the contradictory part unless the court determines that (A) the person reasonably believed the prior statement to be true based on facts known to the person at the time the prior statement was made, and (B) the statement in the affidavit or other statement under oath is based on facts that were not known to the person and could not reasonably have been known to the person at the time the prior statement was made or, if the prior statement was made in a deposition, within the time allowed by Rule 2–415(d) for correcting the deposition.

In *Marcantonio*, the plaintiff's expert, Dr. Hutchins, testified in his deposition that he was not going to give an opinion regarding the cause of the plaintiff's death. 406 Md. at 400–401, 959 A.2d 764. In his subsequent affidavit, however, he expressed an opinion that the defendant's failure to properly diagnose the plaintiff's condition and begin immediate treatment was the proximate cause of plaintiff's death. *Id.* Defense counsel argued that this was a material contradiction because the expert did the exact opposite of what he said at the deposition that he was not going to do. *Id.*

The Court of Appeals held that the affidavit did not materially contradict the doctor's deposition testimony within the meaning of Rule 2–501(e). *Id.* at 409, 959 A.2d 764. The Court found that the expert's affidavit did not "make a factual assertion that irreconcilably contradict[ed] his prior sworn testimony," but rather, it appeared to supplement the testimony he provided at deposition. *Id.* at 413, 959 A.2d 764. The Court explained:

> At deposition, counsel asked Dr. Hutchins if he was going to be rendering an opinion as to causation and Dr. Hutchins responded no. It is quite conceivable that Dr. Hutchins did not intend to render an opinion as to causation at the time of his deposition, and yet later decided to offer one. Although Dr. Hutchin's affidavit is inconsistent with the intention he expressed at his deposition; it is not factually contradictory to, or irreconcilable with, his deposition testimony. Dr. Hutchins did not state at deposition that he *could not* render an opinion as to causation or that it was *unlikely* that the Medical Providers' failure to diagnose [plaintiff's] cancer caused her death. Thus, we conclude that it was not a material contradiction for Dr. Hutchins to at one point indicate that he did not intend to do something, and then later in spite of his earlier inclination to do that thing he did not originally intend to do.

*Id.*

This case is not helpful to appellants. The trial court here did not exclude the errata sheet or testimony on the basis of Rule 2–501(e). Rather, the judge excluded evidence that Dr. Martin violated the standard of care in his handling of the code because it would have been unfair to allow this new claim to be asserted for the first time several days before trial.

In this regard, we find Judge Wilner's concurring opinion in *Marcantonio* to be instructive. Judge Wilner stated that, although he agreed that the striking of the affidavit in that case could not be justified by Rule 2–501(e), "there was clearly another ground upon which, had it been argued, the Court could, and probably should, have" excluded the affidavit. *Id.*

at 417, 959 A.2d 764. Judge Wilner stated that these affidavits, which established a proximate cause of the plaintiff's death for the first time, "decisively changed the legal landscape." *Id.* at 418, 959 A.2d 764. Judge Wilner explained:

> [W]ithout the affidavits, the plaintiff had failed to establish the proximate cause of Ms. Schaefer's death and therefore had failed to establish their cause of action. With the affidavits, a sufficient case *has* been made to avoid summary judgment. The problem, of course, was that, with discovery having been closed four months earlier and with the defendants reasonably believing that Dr. Hutchins would not be offering an opinion to causation, the defendants were essentially ambushed two weeks before the hearing on their motion, without any explanation and without any ability, prior to the hearing, to conduct further discovery as to the basis for Hutchins's new opinion.

*Id.*

> As Judge Wilner observed:

> That kind of practice is exactly what scheduling and discovery orders are designed to prevent. The belated offering of new opinions from previously deposed experts is no different than a party—plaintiff or defendant—coming up with new experts after discovery has been closed.

*Id.* at 419, 959 A.2d 764. Excluding that kind of evidence "is a matter of basic fairness and of assuring that litigation is pursued in an efficient and professional manner." *Id. Accord Hill v. Wilson,* 134 Md.App. 472, 485, 760 A.2d 294 (2000) (It is "especially crucial" for the trial court to exclude evidence not disclosed by discovery when the disclosure is " 'on the eve of trial ... [where] the injury inherent in failure to make discovery is unfair surprise.' ") (quoting *Beck v. Beck,* 112 Md.App. 197, 209, 684 A.2d 878 (1996)).

In the present case, allowing Dr. Cocozzo to express his opinion that Dr. Martin violated the standard of care with respect to his conduct after Dr. Orr arrested, when there had been no testimony to this effect prior to the filing of the errata sheet, would have "ambushed" appellees days before the

scheduled trial. The trial court properly exercised its discretion in striking the errata sheet and in precluding appellants from offering evidence that Dr. Martin mishandled the code. *See Hill,* 134 Md.App. at 489, 760 A.2d 294 (appellate courts may not reverse the decision of a trial judge to impose sanctions for a failure of discovery unless there is an abuse of discretion).

## IV.

### Exclusion of Second Anesthesiology Expert

■ Appellants' fourth contention is that the trial court erred by denying their request, after their initial designation of experts, to add an additional expert in the field of anesthesiology. To put this claim in perspective, it is necessary to set forth the chronology of events leading to the court's ruling on this issue.

On May 22, 2006, the circuit court issued a scheduling order pursuant to Rule 2–504.[15] The Scheduling Order provided:

> This Order is your official notice of dates and required Court appearances. *ANY* MODIFICATIONS OF THIS SCHEDULING ORDER MUST BE REQUESTED BY WRITTEN MOTION AND FILED *BEFORE* THE COMPLIANCE DATE(S). The motion must provide good cause to justify the requested modification. Stipulations between counsel shall not be effective to change any deadlines absent court approval. Failure to appear or comply with all terms may result in dismissal, default judgment, refusal to let witnesses testify, refusal to admit exhibits, the assessment of costs and expenses, including attorney fees, or other sanctions.

---

**15.** Maryland Rule 2–504 provides in relevant part:

(a) **Order required.** (1) Unless otherwise ordered by the County Administrative Judge for one or more specified categories of actions, the court shall enter a scheduling order in every civil action, whether or not the court orders a scheduling conference pursuant to Rule 2–504.1.

The scheduling order required the appellants to identify their expert witnesses by November 8, 2006, the appellees to identify their expert witnesses by December 22, 2006, and that discovery be completed on March 7, 2007. The scheduling order further provided that:

> Compliance with identification of experts requires one to provide in writing, in the manner set forth in rule 2–402(f)(1), the names of the experts to be called as witnesses along with the substance of their testimony including findings, opinions and reasons therefor. Copies of all reports must be attached.

On November 8, 2006, appellants designated the following three liability experts,[16] and the summary and grounds of their opinions:

1. Stephanie Mann, M.D.: "Dr. Mann is offered as an expert in the area of obstetrics and gynecology, standard of care, causation, and damages. Dr. Mann is expected to testify within a reasonable degree of medical probability that the defendants violated the applicable standard of care, and said violations are a proximate cause of Tracy Orr's death."

2. Jeffrey Cocozzo, M.D.: "Dr. Cocozzo's is offered as an expert in the area of [anesthesiology], standard of care, causation, and damages. Dr. Cocozzo is expected to testify within a reasonable degree of medical probability that the defendants violated the applicable standard of care, and said violations were a proximate cause of Tracy Orr's death."

3. Kris Sperry, M.D.: "Dr. Sperry is offered as an expert in the area of forensics, causation, and damages. Dr. Sperry is expected to testify within a reasonable degree of medical probability as to causation of the death of Tracy Orr."

On January 19, 2007, more than two months after the deadline for designating experts, appellants filed a "Motion

---

16. They designated a fourth expert witness on the issue of damages.

For Leave To Add Expert Witness," seeking to designate a second expert in the field of anesthesiology. In support of their motion, appellants stated that appellees had identified "more than a dozen expert witnesses, including three anesthesiologists." They noted that they had identified one anesthesiologist, and they wished to "add a second." They further stated: "No discovery has taken place of any experts at this time and Defendants clearly cannot be prejudiced."

The sole basis for appellants' request to add another expert witness after the deadline was that appellees had a greater number of expert witnesses. Appellants did not proffer any other reason for needing a second anesthesiology expert, nor did they include in their motion a summary and grounds of any opinions that a second anesthesiology expert would testify to at trial.[17]

On February 2, 2007, GWAPC and Stephen Martin, M.D. filed an opposition to the motion, arguing that appellants were not advising them timely of the basis of their claims. Appellees GWAPC and Stephen Martin, M.D. stated:

> The Statement of Claim was filed by Plaintiffs in the Health Care Alternative Dispute Resolution Office on November 4, 2005, just several days before the statute of limitations was about to expire.... Other than generally alleging negligence, the Statement of Claim does not provide any insight or detail regarding how Dr. Martin allegedly breached the standard of care. Likewise, when the claim was waived from Health Claims and suit re-filed in the Circuit Court for Montgomery County, the Complaint failed to disclose any meaningful description of how the care of any of the Defen-

---

17. The last line in appellants' "Motion For Leave To Add Expert Witness" states: "Plaintiff attaches hereto his proposed supplemental expert designation." No such "supplemental expert designation," however, is attached to that motion in either the record extract prepared by appellants or in the record of the original pleadings transmitted by the circuit court. Plaintiffs' Supplemental Designation of Expert Witness is found in an unrelated place in the record extract; it appears to be an attachment to an unrelated pleading. Thus, it is not clear that the judge had this designation before him in ruling on the motion.

dants failed to comply with the standard of care. To date, Plaintiffs have failed to disclose any meaningful information with regards to what they contend Defendants Martin and GWAPC did that failed to comply with the standard of care and how these alleged failures caused Dr. Orr's unfortunate death.

Appellees argued that the May 2006 scheduling order required appellants' expert designations to be filed by November 7, 2006. The filing on that date, according to appellees, was

woefully inadequate in that it fails to even try to comply with the requirements of Md. Rule 2–402(f)(1).[18] Plaintiff's expert designation does not identify any opinion held by these experts, nor does it describe a summary of the grounds or basis for each opinion. Despite requests by defense counsel seeking a designation in compliance with the Maryland Rules and the Scheduling Order, Plaintiffs have utterly failed and refused to provide a meaningful designation.

Appellees argued that the motion to add another expert two and one-half months after the time for expert designation should be denied because it was long after the time required by the scheduling order and because appellants failed "to present any evidence of good cause for the late designation." They argued that the reason proffered by appellants, that defense counsel had more experts than the appellants, did not amount to good cause. By order dated March 21, 2007, the circuit court denied appellants' motion for leave to add experts.

---

**18.** Maryland Rule 2–402(f)(1) provides in part, as follows:

(f) **Trial preparation—Experts.** (1) Expected to be called at trial.

(A) Generally. A party by interrogatories may require any other party to identify each person, other than a party, whom the other party expects to call as an expert witness at trial; to state the subject matter on which the expert is expected to testify; to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the ground for each opinion; and to produce any written report made by the expert concerning those findings and opinions. A party also may take the deposition of the expert.

Two months later, in May 2007, appellants filed a motion for reconsideration of the court's order denying their request to add a second anesthesiology expert. Appellants listed the experts they previously had designated and the experts designated by appellees, again comparing the numbers of experts designated by each side. Appellants stated that expert discovery had not yet commenced, with the exception of the deposition of one expert, and that the parties had "agreed to a consent motion extending discovery." Therefore, appellants argued, there would be no prejudice to appellees. Although appellants stated that the "testimony that would be offered by Dr. Goldstein is critical" to the case, they did not proffer in the motion the opinion that Dr. Goldstein would render, why his testimony was "critical" to the case, or how this opinion would differ from that of the first anesthesiology expert they had timely identified.[19]

Appellees opposed the motion for reconsideration, noting that appellants "have not offered any reason to justify ignoring the Scheduling Order," and that they "failed to offer good cause to allow the late designation." By order dated June 29, 2007, the trial court denied appellants' motion for reconsideration.

---

19. As indicated, our review of the record provided on appeal suggests that the appellants' supplemental designation of expert witness was not attached to the motion to designate an additional expert. There is no indication that it was attached to the motion for reconsideration. The designation, which appears in the record extract as an exhibit to an unrelated motion, provides that Dr. Goldstein would provide the following opinion:

[T]hat Dr. Martin deviated from the standard of care in not properly monitoring Dr. Orr and not responding in a fashion consistent with the standard of care when she developed a sudden event that caused her to avoidably die. It is his opinion within a reasonable degree of medical probability that had the standard of care been followed, that Dr. Orr would not have died. The deviations include failure to properly respond to the crisis that occurred during the delivery process, including the timely administration of proper medication such as epinephrine to the patient when she suffered an event. The deviations also include not properly and timely maintaining an oral airway.

Appellants contend that the trial court erred in denying their request to add a second anesthesiology expert, noting that their initial request was made seven months in advance of trial and prior to the commencement of expert discovery. Appellants further note that their motion for reconsideration was filed about the same time that the parties submitted a consent motion modifying the trial court's scheduling order. Thus, they argue, appellees would have had adequate time to depose the new expert. Under these circumstances, appellants assert that the trial court abused its discretion in denying their request to add another expert.

Appellees contend that the circuit court properly exercised its discretion in precluding appellants from adding another expert witness under the circumstances here. Appellees note that appellants' request to add the second anesthesiology expert was made more than two months after the date set forth in the scheduling order, and it "failed to provide any information regarding the subject matter on which Dr. Goldstein was expected to testify, the substance of his findings, the opinions on which he was expected to testify and a summary of the grounds for each opinion, all of which are required by Rule 2–402(f)(*l*)(A)."

Moreover, appellees contend that appellants failed to establish "good cause" for the late designation of the second anesthesiology expert. Appellees assert:

The *only* purported basis set forth in Appellants' single page motion seeking to add a new expert was that Appellants, despite the severity of the case, the length of time the case had been pending and the number of parties sued, *chose* to retain and offer just one expert in the field of anesthesiology at the time their expert designation was due. When the multiple defendants identified their experts, a total of three anesthesiology experts were identified. Appellants argue that their *choice* to identify just one expert in the field of anesthesiology somehow morphed into good cause for them to identify an additional expert after Appellees' expert designation. Judge McGann did not abuse his

discretion by concluding this sole basis offered by Appellants did not amount to good cause.

(Footnote omitted).

 The Court of Appeals has stated that "[t]he principal function of a scheduling order is to move the case efficiently through the litigation process by setting specific dates or time limits for anticipated litigation events to occur." *Dorsey v. Nold,* 362 Md. 241, 255, 765 A.2d 79 (2001). In *Helman v. Mendelson,* 138 Md.App. 29, 47, 769 A.2d 1025, *cert. denied,* 365 Md. 66, 775 A.2d 1216 (2001), this Court stated that "good faith compliance with scheduling orders is important to the administration of the judicial system and providing all litigants with fair and timely resolution of court disputes." A scheduling order does not "enlarge or constrict the scope of discovery," but rather, it sets "time limits on certain discovery events." *Rodriguez v. Clarke,* 400 Md. 39, 60, 926 A.2d 736 (2007) (citation omitted).

With respect to sanctions for violation of a scheduling order, the Court of Appeals has explained:

> Just as there are sanctions for the violation of discovery rules, sanctions are available for the violation of directives and scheduling orders, although they are not specified in any rule.... Apart from any actual prejudice that may be suffered by the party in not receiving the information in a timely fashion, or that may be suffered by the court if trial has to be postponed, the court is demeaned by noncompliance with its order.

*Dorsey,* 362 Md. at 256–57, 765 A.2d 79.

This Court has upheld a trial court's ruling excluding expert testimony when the expert was not identified until after the deadline set in the scheduling order. *See Shelton v. Kirson,* 119 Md.App. 325, 332, 705 A.2d 25 (no abuse of discretion in excluding testimony of expert designated 12 months after the deadline), *cert. denied,* 349 Md. 236, 707 A.2d 1329 (1998). *See also Naughton v. Bankier,* 114 Md.App. 641, 653, 691 A.2d 712 (1997) (abuse of discretion to *allow* expert witness to testify

when not identified until one year past the deadline and one business day before trial).

▬▬▬▬ In looking at the propriety of a sanction for a violation of a scheduling order, the reasons given for noncompliance, and the need for an exemption from the time deadlines imposed, are significant. In *Maddox v. Stone*, this Court stated: " '[W]hile absolute compliance with scheduling orders is not always feasible from a practical standpoint, we think it quite reasonable for Maryland courts to demand at least substantial compliance, or, *at the barest minimum*, a good faith and earnest effort toward compliance.' " 174 Md.App. 489, 499, 921 A.2d 912 (2007) (quoting *Naughton*, 114 Md.App. at 653, 691 A.2d 712). A party's "good faith substantial compliance with a scheduling order is ordinarily sufficient to forestay" the exclusion of "a key witness because of a party's failure to meet the deadlines in its scheduling order." *Id.* at 501, 691 A.2d 712. Ultimately, however, " 'the appropriate sanction for a discovery or scheduling order violation is largely discretionary with the trial court.' " *Id.* (quoting *Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533, 545, 745 A.2d 1026 (2000)).

A trial court's discretionary rulings will be disturbed only upon a finding of an abuse of discretion. *Wilson v. Crane*, 385 Md. 185, 199, 867 A.2d 1077 (2005). "[A]n abuse of discretion should only be found in the extraordinary, exceptional, or most egregious case." *Id.* This standard has been summarized as follows:

"There is an abuse of discretion 'where no reasonable person would take the view adopted by the [trial] court[ ]' . . . or when the court acts 'without reference to any guiding principles.' An abuse of discretion may also be found where the ruling under consideration is 'clearly against logic and effect of facts and inferences before the court[ ]' . . . or when the ruling is 'violative of fact and logic.' "

"Questions within the discretion of the trial court are 'much better decided by the trial judges than by appellate courts, and the decisions of such judges should only be disturbed

where it is apparent that some serious error or abuse of discretion or autocratic action has occurred.' In sum, to be reversed 'the decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.' "

*Id.* at 198–99, 867 A.2d 1077 (quoting *In re: Adoption/Guardianship No. 3598,* 347 Md. 295, 312–13, 701 A.2d 110 (1997)) (other internal citations omitted).

 Nonetheless, we will "reverse a decision that is committed to the sound discretion of a trial judge if we are unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the *exercise* of discretion." *Maddox,* 174 Md.App. at 502, 921 A.2d 912. Thus, "the record must reflect that the judge exercised discretion and did not simply apply some predetermined position." *Id.* at 502, 921 A.2d 912. *See also Nelson v. State,* 315 Md. 62, 70, 553 A.2d 667 (1989) ("The discretion is broad but it is not boundless. If the judge has discretion, he must use it and the record must show that he used it.").

In this case, there is no contention that the trial court did not exercise its discretion in denying appellants' motion. Appellants allege that the court abused its discretion, but they do not allege that it failed to exercise its discretion. Indeed, the trial court's June 29 order denying the motion for reconsideration makes clear that the court considered the facts of the case in rendering its decision:

Having Considered the Plaintiff's Motion for Reconsideration of the Court's Order Denying Plaintiff's Motion to Add Expert, and the Defendants' opposition thereto, this Court finds that unlike *Maddox v. Stone* there was no "substantial compliance" with the Court's scheduling Order in naming David Goldstein, M.D. as an expert. *See* 174 Md.App. 489, 921 A.2d 912 (2007); *see also Rodriguez v. Clarke* [400 Md. 39, 926 A.2d 736 (2007)]. Furthermore, the Court considered in its earlier ruling that the Plaintiff has already named an

anesthesiologist and that the Defendants has [sic] named more experts than Plaintiff.

Thus, the issue here is whether the court abused its discretion in denying appellants' request to name a second expert in the field of anesthesiology. As noted, that request was made approximately two months after the scheduling order deadline for the identification of appellants' experts. This fact, by itself, is not dispositive because, as appellants note, trial was not scheduled to begin for seven months and discovery regarding the experts was ongoing.

What is significant, however, is that appellants offered no good cause for their late designation of a second anesthesiologist. This Court has explained:

When a trial court permits a party to deviate from a scheduling order without a showing of good cause, such action by the trial court would be "on its face, prejudicial and fundamentally unfair to opposing parties, and would further contravene the very aims supporting the inception of Rule 2–504 by decreasing the value of scheduling orders to the paper upon which they are printed."

*Faith v. Keefer,* 127 Md.App. 706, 711, 736 A.2d 422 (1999) (quoting *Naughton,* 114 Md.App. at 654, 691 A.2d 712). *Accord Shelton,* 119 Md.App. at 332–33, 705 A.2d 25.

Here, the sole basis set forth in appellant's motion to add a new expert after the deadline for designating experts was that appellees had named more expert witnesses than appellants, including three anesthesiologists for appellees as opposed to one anesthesiologist designated by appellants. Even on appeal, appellants rely on that reasoning. In their brief they state:

Had the trial court permitted Mr. Livingstone to amend his expert designation, the end result would simply bring the number of anesthesiology experts identified by Mr. Livingstone to two: still one fewer than the number of anesthesiology experts offered by appellees. And even if the trial court had permitted Mr. Livingstone to add Dr.

Goldstein, the Appellees would still have identified thirteen experts to Mr. Livingstone's five.

We cannot find an abuse of discretion in the denial of a request to add an expert after the time designated in the scheduling order when the sole basis for the request is that the other side has designated a greater number of experts. Certainly, appellants must have anticipated, in a medical malpractice case against multiple defendants, the possibility that multiple experts would be listed by the defendants. Appellants have not explained why, if the number of experts was so important, they did not initially designate more experts. And, other than referring to the numbers of experts designated by each party and stating that Dr. Goldstein's testimony was "critical," appellants did not indicate in their motion why it was necessary to have Dr. Goldstein testify.[20]

In *Maddox*, 174 Md.App. at 508, 921 A.2d 912, this Court found an abuse of discretion in the trial court's exclusion of an expert witness based on the failure to disclose the expert's report until 34 days after the deadline in the scheduling order. This Court held that a sanction excluding a key witness, without whom there is no claim, "should be reserved for egregious violations of the court's order, and should be supported by evidence of willful or contemptuous or otherwise opprobrious behavior on the part of the party or counsel." *Id.* at 507, 921 A.2d 912.

In this case, when appellants filed their motion to designate Dr. Goldstein as an expert witness, they already had designated an expert in the field of anesthesiology. Appellants did not explain why they did not initially designate Dr. Goldstein as an expert, why Dr. Goldstein was a key witness, or why, when they already had an expert in the field of anesthesiology, it

---

20. Appellants argue in their brief on appeal that the statement that Dr. Goldstein's testimony was critical "became particularly accurate in light of other rulings made by the trial court that are the subject of this appeal," referring to the court's subsequent ruling regarding Dr. Cocozzo, discussed, *supra.* Consideration of subsequent rulings is not appropriate in the determination whether the trial court properly exercised its discretion in ruling on the motions in early 2007.

was necessary to designate another anesthesiologist as an expert witness.

It may be that another judge would have allowed appellants, in this serious medical malpractice case, to designate another expert witness seven months prior to trial. That, however, is not the test. *See Aventis Pasteur, Inc. v. Skevofilax,* 396 Md. 405, 425, 914 A.2d 113 (2007) ("[A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.") (quoting *North v. North,* 102 Md.App. 1, 14, 648 A.2d 1025 (1994)). *Accord Dehn v. Edgecombe,* 384 Md. 606, 628, 865 A.2d 603 (2005). In light of appellants' failure to proffer why the additional expert was necessary to his case, we hold that the trial court did not abuse its discretion in denying appellants' motion.

## V.

### Jury Deliberations On Friday Evening

 The jury began deliberations on Friday, September 14, 2007, at approximately 7:00 p.m. and it returned a verdict approximately three hours later.[21] Appellants contend that the trial court erred in allowing the jury to begin deliberations at approximately 7:00 p.m. on a Friday evening after eight days of trial testimony in a complicated medical malpractice action. They contend that "the trial court should have required the jury to come back on Monday morning to deliberate, to assure that the jury was faithful to its oath to consider *all* of the evidence presented."

Appellants cite no authority in support of their contention. We could dispose of their argument on this ground alone. *See Anderson v. Litzenberg,* 115 Md.App. 549, 577–78, 694 A.2d 150 (1997) (refusing to address argument because appellants failed to cite any legal authority to support their contention of

---

21. The record does not reflect the actual time the jury returned its verdict. Appellants contend that it was at 9:30 p.m. Appellees believe that it was at approximately 10:30 p.m.

error). We will, however, exercise our discretion to address this claim. As explained below, we find it to be without merit.

A similar argument was made, and rejected, in *Bever v. State*, 4 Md.App. 436, 243 A.2d 634 (1968). In that case, defense counsel requested a continuance of a criminal trial because the trial would not begin until 3:24 p.m., asserting that the jurors were probably tired, irritated, and ready to go home after spending the day in the courthouse doing nothing. *Id.* at 437, 243 A.2d 634. The trial judge asked the jury if the timing of the case "would in any way be prejudicial in reaching a decision in the case." *Id.* at 438, 243 A.2d 634. The jury did not indicate any problem with proceeding, and the judge denied the request for a continuance. *Id.* The trial ended at 7:31 p.m., and the jury returned a guilty verdict within seventeen minutes. *Id.* at 438–44, 243 A.2d 634.

On appeal, Bever argued that he did not receive a fair trial due to the late hour of the trial, and, in support of that argument, he pointed to the fact that "the jury deliberated only seventeen minutes." *Id.* at 439, 243 A.2d 634. This Court rejected that argument, stating: "It cannot be presumed here from the length of the jury's deliberation that they did not properly fulfill their sworn duty." Noting that it was within the trial court's discretion whether to grant a continuance, the Court stated: "We have no difficulty in finding that the trial court did not abuse its discretion and that the appellant was not denied a fair trial by the case being then tried." *Id.* at 438, 243 A.2d 634.

The same reasoning applies here. As in *Bever*, the trial court inquired of the jury whether it objected to beginning deliberations on Friday evening:

THE COURT: Ladies and gentlemen, what I'm prepared to do is have you retire into the jury room with your notes and everything else and begin your deliberations, and furnish you with a menu pretty soon . . . and I will bring you dinner . . . and let you get started and see where you are. And that's what I'm inclined to do, unless there's any strong objection to that. Would you all prefer to do that?

No objection by any juror is reflected in the record. There was no abuse of discretion in allowing the jury to begin deliberations on Friday evening.

Moreover, there is nothing in the record to support appellants' suggestion that the jury rushed through the evidence. Although this was a relatively lengthy trial, the jury deliberated for close to three hours. And as noted, the jury concluded that appellees did not violate the standards of care in their treatment of Dr. Orr, and therefore, they did not reach the issues of causation and damages. Thus, the jury did not need to address several issues that consumed a substantial portion of the trial testimony.

Finally, we note that, after the reading of the verdict, the trial judge granted an unidentified juror's request to say something on the record. The juror addressed Mr. Livingstone and stated:

> JUROR: But we've been talking a lot about this tonight and, you know, it's a very tough case. A very tough decision. You know, both sides did a great job putting on their case, and you know, ultimately nobody wins and we just really want to express our condolences to you and say how sorry we are and, this was a very difficult decision for us. And we hope you know that we were thoughtful and weighed the evidence.

The record does not support appellants' argument that the jury was rushed in their deliberations or that they failed to be faithful to their oath to consider all the evidence. This claim is devoid of merit.

## VI.

### Appellees Cross Appeal—Sufficiency of the Certificates

Appellees Dr. Martin and Greater Washington Anesthesia and Pain Consultants, P.C. filed a cross-appeal in which they allege that the Certificates of Merit filed by Dr. Mann and Dr. Sperry failed to attest that appellees violated any standard of care in their treatment of Dr. Orr and that any such violation

was a proximate cause of Dr. Orr's death as required by CJP § 3–2A–04(b)(1). Appellees contend that the circuit court erred in denying their motion to dismiss on these grounds. Because we are affirming the judgment of the circuit court in favor of appellees on all issues, we will not address this issue raised by appellees in their cross appeal.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**