*Asmussen v. CSX Transportation, Inc.*, No. 814, September Term 2019
Opinion by Kehoe, J.

## PRETRIAL PROCEDURE – SCHEDULING ORDERS – AMENDMENT OR MODIFICATION

Scheduling-order deadlines are not unyieldingly rigid, and, under Md. Rule 2-504(c), the circuit court "shall" modify scheduling orders "to prevent injustice." But the deadlines are not to be complaisantly lax either. Only when substantial compliance with the scheduling order and good cause for deviation have been shown by the party unable to meet the order's deadlines does modification "prevent injustice." Md. Rule 2-504(c).

## PRETRIAL PROCEDURE – PRETRIAL MOTIONS – COMPETENCY OF UNDISCLOSED WITNESSES

There is no substantive difference between a decision to modify (or adhere to) scheduling-order deadlines and a decision to admit (or strike) witnesses and other evidence designated or disclosed too late. Both are decisions to accommodate (or not) a party's failure to meet the discovery deadlines originally fixed by the circuit court. Accordingly, the same considerations should guide the circuit court's discretion in making the decisions—whether cast in terms of the factors listed in *Taliaferro v. State*, 295 Md. 376 (1983), or, more simply, in terms of substantial compliance and good cause.

## PRETRIAL PROCEDURE – PRETRIAL MOTIONS – COMPETENCY OF UNDISCLOSED WITNESSES

The circuit court did not abuse its discretion in striking a critical witness when the failure to meet the scheduling order deadlines resulted from an indefensible lack of diligence.

## JUDGMENT – ON MOTION OR SUMMARY PROCEEDING – NATURE OF SUMMARY JUDGMENT

A motion for summary judgment is a screening device, used by courts to identify and end cases where there is no need for a trial. In some cases, a trial may be unnecessary because the parties generally agree about the (material) facts and those facts are not susceptible to more than one inference; the parties require only a judicial assessment of the legal implications of the facts involved. In other cases, a trial may be unnecessary because one party lacks the proof that would be needed to establish an essential element of his case to a jury. In both scenarios, the court awards summary judgment because, based on the facts that *would be* admitted at trial, the evidence so unmistakably favors one side that no fair-minded jury could conclude to the contrary.

Circuit Court for Baltimore City
Case No. 24-C-18-001272 OT

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 814

September Term, 2019

_____

PAUL ASMUSSEN

v.

CSX TRANSPORTATION, INC.

_____

Kehoe,
Berger,
Shaw Geter,

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: September 10, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

After he was diagnosed with kidney cancer, Paul Asmussen sued his former employer, CSX Transportation, Inc. ("CSX"). Asmussen's claim, brought under the Federal Employers' Liability Act ("FELA"), alleged that his cancer had been caused by exposure to toxic agents during the eleven-year period in which he worked as a trackman for CSX.

At the close of discovery, Asmussen was at risk of losing critical expert witnesses, and so he moved to extend the deadline for expert-witness designations and for the completion of discovery by modifying the operative scheduling order for the case. The Circuit Court for Baltimore City, the Honorable Lawrence P. Fletcher-Hill presiding, denied this motion to modify. Additionally, the court granted CSX's motions to strike two of Asmussen's experts and, ultimately, a motion for summary judgment in favor of CSX.

Asmussen's appeal challenges the circuit court's disposition of all these motions. He presents three issues, which we have reworded:

1. Did the circuit court abuse its discretion when it denied Asmussen's motion to modify the scheduling order?

2. Did the circuit court abuse its discretion when it granted CSX's motions to strike two of Asmussen's expert witnesses?

3. Did the circuit court err in granting CSX's motion for summary judgment?[1]

---

[1] Asmussen's appeal presents the questions thus:
1. Did the trial court abuse its discretion when it denied Appellant's Motion to Modify without regard to law or facts and to adhere to a target date for resolution of the case?

2. Did the trial court abuse its discretion when it granted Appellee's motions to strike Appellant's expert witnesses in the absence of conduct by counsel permitting such a case-ending sanction?

Because the answer to each of these questions is no, we affirm the circuit court's judgment.

## Background

The facts of this case are well known to the parties. Our summary is brief — at least compared to the thorough 1,265-page record extract generated for this appeal. Additional facts are incorporated into our analysis as needed.

*Asmussen's work, his injury, and his lawsuit*

Asmussen worked as a trackman for CSX from 1977 to 1988. His duties included, among other things, dumping new ballast (quartz-containing crushed rock) along the tracks. This was grueling work, performed between March and July of each year. In the earlier years of his employment, Asmussen had to tug on thirty-foot chains to open the doors of the hopper cars carrying the ballast. Later on, he used a come-along winch to regulate the flow. On average, it took Asmussen five to six hours to dump six to ten carloads of ballast each day.

To limit his exposure to the dust produced by dumping ballast, Asmussen wore safety goggles, a wet bandana and, later, a company-provided paper respirator. But at day's end,

---

3. Does a genuine issue of material fact exist as to CSXT's negligence and causation thus requiring denial of Appellee's Motion for Summary Judgment?

Asmussen was still covered with dust—and full of it too. Each afternoon, he took a shower and blew out the dust that had formed into a paste-like substance in his nose.

Asmussen's employment with CSX exposed him to some other potentially harmful substances. Rail-repair work required him to heat rails by burning diesel-soaked wicks laid alongside them. Asmussen inhaled smoke from the burning wicks. Asmussen was also exposed to creosote—by vapor inhalation and skin contact—when handling new rail ties.

In November 2015, almost three decades after he left CSX, Asmussen was diagnosed with kidney cancer. Two months later, he had his right kidney removed.

On March 6, 2018, Asmussen sued CSX in the Circuit Court for Baltimore City. His complaint alleged a violation of the FELA, a federal law that imposes liability on railroads (engaged in interstate commerce) for negligence that injures or kills employees. *See* 45 U.S.C. § 51 (2018). Asmussen claimed that as a result of CSX's negligence, he had been exposed to several toxic agents during his employment—including silica, which is found in quartz-containing ballast. As a "direct and proximate result" of this exposure, Asmussen alleged, he had developed cancer.

*Scheduling order and expert-witness designations*

The operative scheduling order in the case was issued by the circuit court on July 10, 2018. The order, as amended on August 24, 2018, fixed the following important dates:

**October 10, 2018:** Deadline to designate Asmussen's experts.

**January 9, 2019:** Deadline to designate CSX's experts.

**February 9, 2019:** Deadline to designate Asmussen's rebuttal experts.

| **March 11, 2019:** | Deadline for all discovery, including full resolution of discovery disputes. |
|---|---|
| **April 11, 2019:** | Deadline for dispositive motions, motions to exclude expert testimony, and requests for a *Frye–Reed* hearing to determine the admissibility of science-based expert testimony. |
| **July 10, 2019:** | Pretrial conference. |
| **August 12, 2019:** | Trial to begin. |

The scheduling order required that all expert-witness designations include the information specified in Md. Rule 2-402(g).[2] By its terms, the order was subject to modification upon written motion filed within fifteen days of the order's date. Thereafter, the scheduling order could still be modified, but "only upon a written motion for modification setting forth a showing of good cause that the schedule cannot reasonably be met despite the diligence of the parties seeking modification."

Asmussen served his expert-witness designation on CSX on the last possible date permitted under the scheduling order: October 10, 2018. The designation identified four expert witnesses: Drs. Joseph Regna, James Dahlgren, Christopher Runz, and Patrick

---

[2] Md. Rule 2-402 delineates the scope of discovery in civil cases. Under the rule, parties may require their opponents to identify, *inter alia*, all nonparty witnesses expected to be called at trial. Md. Rule 2-402(g)(1)(A). Additionally, parties may be required

> to state the subject matter on which the expert is expected to testify; to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion; and to produce any written report made by the expert concerning those findings and opinions. A party also may take the deposition of the expert.

*Id.*

Shanahan. The designation did not provide any concrete expert-specific information. It simply notified CSX, in broad strokes, that

> [o]ne or more of [the four listed] experts may offer their opinions about the cause, diagnosis, prognosis and permanency of, and the treatment rendered for, any injuries the Plaintiff suffered in the occurrence at issue in this action and the reasonableness and necessity of the medical treatment received and the damages incurred as a result thereof. The experts may base those opinions on training, knowledge, expertise, experience, pleadings, discovery responses, medical records, testimony and any other information available.

Believing this vague expert-witness designation did not comply with the requirements of Md. Rule 2-402(g), counsel for CSX emailed Asmussen's counsel on October 23, 2018, to request additional information. On November 8, Asmussen served an amended expert-witness designation. The designation identified Drs. Regna and Dahlgren as causation witnesses, noting that they were "expected to testify that Mr. Asmussen's kidney cancer was caused by exposure to one or more [t]oxic [a]gents" but that, at the time of designation, the doctors "require[d] additional information, including [safety data] for the ballast and Mr. Asmussen's deposition testimony, before the precise [t]oxic [a]gent(s) that caused Mr. Asmussen's [k]idney [c]ancer c[ould] be identified." Dr. Runz, now identified as one of Asmussen's treating physicians, was "expected to testify that Mr. Asmussen was diagnosed with [k]idney [c]ancer, the prognosis [and] the treatment options for Mr. Asmussen's kidney cancer, and that the treatment rendered for Mr. Asmussen's kidney cancer, and expenses related thereto, was reasonable and necessary." Dr. Shanahan was not included in the amended designation.

For all three experts, Asmussen "reserve[d] the right to supplement" their designations. Asmussen also "reserve[d] the right" to call any other of his treating physicians "to testify at trial as expert witnesses consistent with their reports."

CSX remained dissatisfied with Asmussen's expert-witness designations and, on November 21, 2018, filed a motion to compel additional disclosures. The thrust of CSX's argument was that the amended designations still required CSX to play a "guessing game" as to who would ultimately testify and what these witnesses would say. The circuit court, the Honorable Audrey J. S. Carrión presiding, denied this motion without explanation.

*Down to the wire*

On January 22, 2019, Asmussen's counsel sent an email proposing dates for the depositions of Drs. Regna and Runz, saying that each doctor was available the week of February 18 and the week of February 25. In the same email, Asmussen's counsel withdrew Dr. Dahlgren from the list of designated plaintiff's experts. Counsel said he would submit an amended expert report to confirm the withdrawal. (From the record before our court, it does not appear that any such amended expert report was ever submitted.)

For two reasons, the assurances made in this January 22 email—of Dr. Runz's availability and of Dr. Dahlgren's superfluity—would later prove to be problematic for Asmussen.

First, as we will explain, Dr. Dahlgren wasn't really gone for good. On February 8, 2019, CSX received from Dr. Regna a report concluding that Asmussen's kidney cancer was caused by his exposure to the silica in ballast dust. (The report did not link Asmussen's

- 6 -

cancer to any other toxic agents, like the creosote that coated new rail ties or the smoke Asmussen inhaled when burning diesel-soaked wicks.) Asmussen sent an amended report, with additional source materials, references, and information about Dr. Regna's qualifications, on February 19.

Things fell apart in Dr. Regna's deposition on February 22, 2019. As Asmussen concedes in his brief to this court, Dr. Regna's deposition testimony "revealed that his background, education, training, and experience did not qualify him to opine as to the causation of [Asmussen's] kidney cancer," and "the studies cited by Dr. Regna to support his findings and conclusions did not stand for the proposition that silica causes kidney cancer." Given the fundamental flaws with Dr. Regna's expert testimony, CSX's counsel requested on February 25 that Asmussen voluntarily dismiss his FELA claim with prejudice.

On February 28, after taking a few days to think it over, Asmussen's counsel informed counsel for CSX that Asmussen did not intend to voluntarily dismiss his claim. With fewer than two weeks remaining before the close of discovery, Asmussen's counsel said that his client would rely on earlier-withdrawn expert Dr. Dahlgren to establish the cause of Asmussen's kidney cancer. Asmussen's counsel assured counsel for CSX that "Dr. Dahlgren's report w[ould] be provided as soon as possible" and that "Dr. Dahlren w[ould] be made available for deposition shortly thereafter." But CSX did not receive an expert's report from Dr. Dahlgren within the discovery period and Dr. Dahlgren was not deposed.

CSX did not receive his report until almost two months later, on April 24, and then in as part of Asmussen's response to CSX's motion for summary judgment.

The second reason why the January 22 email from Asmussen's counsel proved problematic was because Asmussen's counsel did not actually know whether Dr. Runz was available to be deposed the week of February 18 or the week of February 25. Asmussen's counsel had tried to contact Dr. Runz to confirm his availability for deposition on January 13, but this attempt was unsuccessful. A later attempt on February 23 was similarly unavailing. Nonetheless, in a February 13 email, Asmussen's counsel told counsel for CSX to schedule Dr. Runz's deposition for February 27. And on February 25, while considering whether to voluntarily dismiss the lawsuit, Asmussen's counsel requested that Dr. Runz's February 27 deposition be pushed back to March 8.

It wasn't until March 1, 2019, that Asmussen's counsel finally made contact with Dr. Runz—by way of a subpoena requiring him to appear for the March 8 deposition. The subpoena triggered a response from Dr. Runz's attorney, Curtis H. Booth, Esq., who told Asmussen's counsel that the delivery of the subpoena had been "the first [his client] was given notice of the contemplated deposition" and that Dr. Runz was "not in a position to voluntarily appear on such short notice" because he had a full day of surgeries scheduled for March 8. Dr. Runz said he was willing to accommodate a deposition on a different date, so long as he was given proper notice.

Dr. Runz's attorney later confirmed in an email to counsel for CSX that, despite Asmussen's earlier representations of Dr. Runz's availability, "at no point were any deposition dates supplied or agreed upon."

*The motions in the circuit court*

Asmussen filed a motion to modify the operative scheduling order on March 11, 2019, the day of the deadline for discovery. Asmussen argued to the circuit court that good cause existed to extend the deadline because (1) he had "substantially complied" with the order, properly designating experts and attempting to schedule their depositions before the discovery deadline, and (2) preventing the deposition of Drs. Runz and Dahlgren, as well as the supplementing of Dr. Dahlgren's designation with an expert report, would "operate as a case-ending sanction." Asmussen also argued that CSX would not be prejudiced by the extension. In fact, Asmussen argued, the extension would benefit CSX by permitting the company to depose the witnesses it had wanted to depose.

CSX opposed the motion to modify the scheduling order. The company maintained that there was no good cause for modification because it was the lack of diligence from Asmussen's counsel that had precluded the timely deposition of Drs. Runz and Dahlgren. According to CSX, Asmussen's counsel could not fairly argue he was surprised by Dr. Runz's unavailability: Asmussen's counsel knew he had not confirmed any dates with Dr. Runz and misled CSX into believing the doctor was available for a deposition anyway— what CSX called "the antithesis of good cause and diligence." Additionally, CSX argued, Asmussen would not have needed to redesignate Dr. Dahlgren as a causation expert less

- 9 -

than two weeks before the end of discovery if his counsel had properly vetted Dr. Regna. The company also rejected the notion that it would somehow be benefitted by an extension of the discovery deadline, since it had already invested substantial resources into refuting the testimony of Asmussen's original causation witness, Dr. Regna.

For similar reasons, CSX moved separately to strike Drs. Runz and Dahlgren as expert witnesses.

On April 10, 2019, CSX filed a separate motion for summary judgment. In its memorandum of support, CSX argued that it was entitled to summary judgment for two reasons. First, Asmussen had no expert to establish the standard of care from which the railroad allegedly deviated. An expert was needed, argued CSX, because "what [CSX] as a member of the railroad industry could or should have done between 1977 and 1988 with regard to [Asmussen's] alleged exposures is beyond the ken of the average layperson." Without evidence of the applicable standard of care, it would be impossible for a jury to determine that CSX failed to meet it. Second, Asmussen did not have an expert capable of establishing the causal link between Asmussen's exposure to silica (or any other toxic agent) and his kidney cancer. Dr. Regna had been unable to identify the level of Asmussen's silica exposure, and he had no scientific support for his opinion that there existed a causal link between kidney cancer and silica exposure at any level. CSX's memorandum seemed to assume that Dr. Dahlgren would be stricken and therefore that his testimony could not establish causation either.

Asmussen made two arguments in response to CSX's motion for summary judgment. First, he argued, negligence could be found without any expert testimony establishing the standard of care. Asmussen maintained that regulations promulgated under the Occupational Safety and Health Act, 29 U.S.C. §§ 651–678, imposed specific duties on CSX whose breach would be readily apparent to jurors. Second, implicitly acknowledging that Dr. Regna could not establish causation, Asmussen argued that Dr. Dahlgren could. He cited the findings and conclusions contained in Dr. Dahlgren's expert report, which was attached to Asmussen's opposition memorandum as an affidavit. This report suggested a causal link existed between Asmussen's kidney cancer and his exposure to silica dust from the ballast. The report also suggested the cancer was caused by exposure to creosote and diesel smoke and fumes. (This was the first time an expert report from Dr. Dahlgren was made available to CSX, and it was the first time an expert had drawn a causal link between Asmussen's cancer and toxic agents besides silica dust.)

The circuit court held a hearing on all these motions on May 29, 2019. In making his ruling from the bench, Judge Fletcher-Hill dealt first with the status of Drs. Dahlgren and Runz as expert witnesses, issues he saw as "obviously wrapped up with both the motion to modify the scheduling order and the defendant's motion to strike those two experts."

With respect to Dr. Dahlgren, the circuit court found that the February 29 attempt to bring Dr. Dahlgren back into the case was, effectively, "a new designation of an expert." The circuit court said that Dr. Dahlgren's initial and amended designations in October and November had not complied with Md. Rule 2-402(g). And even if these designations had

been adequate, Dr. Dahlgren's withdrawal on January 22 was "complete, . . . done without qualification and . . . intended to allow the defendant to remove Dr. Da[h]lgren from any consideration including research and deposing him and proceeding with any discovery concerning him." The circuit court said that "allowing Dr. Da[h]lgren to be essentially identified for the first time at the end of February would mean that he would be identified almost five months after the deadline for plaintiff's identification of experts."

To the circuit court, the central question presented by the competing motions to modify the scheduling order and to strike Dr. Dahlgren was whether Asmussen should be able to make the "tactical choice" to choose one expert to the exclusion of another and then "start over or shift to a new expert" when the earlier-chosen expert proves ineffective. Under the facts of this case, the circuit court did not believe there was sufficient cause to permit Asmussen to change horses in midstream. Dr. Regna had not become unavailable as a witness for some reason beyond Asmussen's control. Rather, the need to switch experts arose because Asmussen's counsel failed to sufficiently vet Dr. Regna before choosing to rely on him exclusively. Even if Asmussen's counsel's lack of due diligence did not amount to "opprobrious" conduct under the circumstances, modifying the scheduling order to permit a last-minute expert swap would prejudice CSX, rendering pointless the significant

resources invested in the discovery of Dr. Regna and risking a delay of the trial beyond the target date for resolution of the case. [3]

With respect to Dr. Runz, the court found any deficiencies in his expert designation "less serious" than those of the causation experts. Because Dr. Runz was a treating physician, Asmussen's medical records "would presumably elucidate much of his opinions." The problem with extending the discovery deadline to permit the deposition of Dr. Runz was that Asmussen's counsel had not made the "appropriate effort" to arrange for Dr. Runz's timely deposition. Instead, Asmussen's counsel told CSX twice to schedule Dr. Runz's deposition "without any assurance that this practicing physician would be available" on those dates. This "entirely unacceptable" behavior, the circuit court concluded, was a "serious violation of the rules and discovery practice," unnecessarily causing opposing counsel to make arrangements for depositions about which the supposed deponent knew nothing.

Considering the above, "weighing all of the factors," the circuit court denied Asmussen's motion to modify the scheduling order to permit additional periods of discovery and granted CSX's motions to strike both of the challenged experts.

---

[3] The circuit court also acknowledged that it had contributed to the potential for pushing back the trial by not dealing with the motion to modify the scheduling order as soon as it was opposed.

- 13 -

After ruling on those motions, the circuit court considered CSX's motion for summary judgment. It granted the motion on two independent grounds. First, because of the problems with Dr. Regna's deposition and because the court had stricken Dr. Dahlgren from the list of plaintiff's experts, Asmussen had no expert to provide a causal link between CSX's alleged negligence and Asmussen's kidney cancer. Second, Asmussen had failed to "proffer[] any expert witness on the standard of care and breach of that standard." The circuit court concluded that to decide whether CSX had been negligent, "a jury would need to hear [about] what the state of the art was with respect to the knowledge of exposure to these substances in the late 70s and 1980s[ and] would need to know about practices of railroads generally." This information would have to come from an industrial hygienist or some other expert not designated by Asmussen. Because of these two holes in Asmussen's case, the circuit court concluded that CSX was entitled to judgment as a matter of law.

**Analysis**

In his appeal to this Court, Asmussen challenges the circuit court's disposition of all the motions discussed above: his motion to modify the scheduling order and CSX's motions to strike two expert witnesses and for summary judgment.

Asmussen's first contention is that the circuit court erred in denying his motion to modify the operative scheduling order. He argues that modification was called for because he had "substantially complied" with the order, "designat[ing] experts, provid[ing] the subject matter on which each expert was expected to testify, stat[ing] the substance of the findings and opinions to which each expert was expected to testify, and summariz[ing] the

- 14 -

grounds for each opinion." He acknowledges that two of his experts, Drs. Dahlgren and Runz, were not timely deposed, but Asmussen says there was good cause for this failure to meet the discovery deadline. Despite his diligence, Asmussen says, the need to switch causation experts at the last minute arose "unexpectedly" when the inadequacies of his first expert were "revealed" to him at Dr. Regna's deposition. And "despite [his] attempts to confirm Dr. Runz's availability," Asmussen says, the doctor gave only three days' notice that the scheduled deposition date—itself just days before the discovery deadline—would not work. Additionally, Asmussen maintains that good cause existed for modification because the denial of the modification motion would operate as case-ending sanction and because the extension of the discovery deadline would not have prejudiced CSX.

Asmussen's second contention is that the circuit court erred in granting CSX's motion to strike from his list of experts Dr. Dahlgren (for his untimely designation) and Dr. Runz (because he could not timely be deposed). He argues that although the circuit court has a good deal of discretion in determining the sanctions to be imposed for violations of discovery rules and scheduling orders, no sanction was warranted here because Asmussen "did not violate the discovery rules or scheduling order—and if so, certainly not on a persistent or deliberate basis." According to Asmussen's brief, his experts were timely designated, and those designations were subsequently "supplemented and/or amended . . . in good faith to address [CSX's] perceived insufficiencies." The decision to (again) rely on Dr. Dahlgren after his withdrawal in January was not a new designation, Asmussen says. And even if it were, he maintains, CSX was "aware of Dr. Dahlgren and the grounds for

- 15 -

his opinion(s)" since the time of his initial expert-witness designation, and so no prejudice resulted. He also argues that he made good-faith efforts to produce Dr. Runz for deposition—all that is required by Maryland's discovery rules, *see Rodriguez v. Clarke*, 400 Md. 39, 61 (2007) (interpreting the rules to require parties to "put forth good faith efforts to obtain and provide access to information needed to proceed to trial"), and the Maryland State Bar Association's discovery guidelines interpreting those rules.

Finally, Asmussen contends that the circuit court erred in granting CSX's motion for summary judgment because he did not need an expert to establish the standard of care allegedly breached by the railroad and because Dr. Dahlgren (if not precluded from testifying) could have established the causal link between Asmussen's kidney cancer and CSX's alleged negligence.

We are not convinced that the circuit court erred.

As the circuit court rightly noted, the issues involved here overlap and hinge upon one another. Rather than winding our way through an analysis of each issue individually—addressing more than is needed to resolve this appeal—we will forge a more direct path. We are guided in this endeavor by two premises upon which we will elaborate. First, there is no substantive difference between a decision to deny a motion to modify a scheduling-order deadline for the designation of expert witnesses and a decision to strike an expert witness for a party's failure to comply with the same scheduling-order deadline. If the circuit court did not err in denying the motion to modify the scheduling order, then it also did not err in striking the witnesses whose designations or depositions did not comply with

the scheduling order's deadlines. Second, if the circuit court did not err in its decision to leave Asmussen without a causation expert (by denial of the motion to modify or by grant of the motion to strike), then summary judgment in favor of CSX was appropriate.

### A. The motion to modify, the motion to strike, and the accommodation of late-designated experts

With certain exceptions, Md. Rule 2-504(a)(1) requires Maryland's circuit courts to enter a scheduling order in every civil action. This scheduling order must specify, among other things, a deadline for the designation of expert witnesses expected to be called at trial, Md. Rule 2-504(b)(1)(B), and a deadline for the completion of all discovery, Md. Rule 2-504(b)(1)(D). The expert-witness designations must include "all information specified in [Md.] Rule 2-402(g)(1)," including the anticipated subject matter of the expert's testimony, the substance of and grounds for the findings and opinions to which the expert will testify, and a copy of any written report made concerning those findings and opinions. Md. Rule 2-504(b)(1)(B).

To some extent, a scheduling order may restrict the scope of discovery. *See* Md. Rule 2-504(b)(2)(A) (providing that scheduling orders may contain "any limitations on discovery otherwise permitted under these rules, including reasonable limitations on the number of interrogatories, depositions, and other forms of discovery"). But its "principal function" is "to move the case efficiently through the litigation process by setting specific dates or time limits for anticipated litigation events to occur." *Dorsey v. Nold*, 362 Md. 241, 255 (2001). As Judge Raymond G. Thieme, Jr., aptly explained, scheduling orders

"light the way down the corridors [along] which pending cases will proceed," *Naughton v. Bankier*, 114 Md. App. 641, 653 (1997), maximizing the efficiency and fairness of the pre-trial discovery process.

By its terms, Md. Rule 2-504 does not provide for sanctions for the failure to strictly adhere to scheduling-order deadlines, but "there is inherent power for the courts to 'enforce their scheduling orders through the threat and imposition of sanctions.'" *Maddox v. Stone*, 174 Md. App. 489, 507 (2007).

The deadlines set in a scheduling order are not "unyieldingly rigid." *Naughton*, 114 Md. App. at 653. Indeed, Md. Rule 2-504(c) provides that the circuit court "shall" modify scheduling orders "to prevent injustice." This is a recognition of the reality that "absolute compliance with scheduling orders is not always feasible" and that, sometimes, "extraordinary circumstances . . . warrant modification." *Naughton*, 114 Md. App. at 653. Trial courts should seek to resolve cases on their merits instead of "sacrificing them on the altar of judicial efficiency." *Helman v. Mendelson*, 138 Md. App. 29, 47 (2001); *see also Maddox*, 174 Md. App. at 506–07 ("In the quest to achieve greater judicial efficiency . . . , the courts must not lose sight of their primary responsibility: to render justice and resolve disputes in a fair and just manner. Scheduling orders are but the means to an end, not an end in and of themselves.").

We are aware of no reported Maryland appellate opinion that deals directly with the disposition of a motion to modify a scheduling order when one party fails to meet the order's discovery deadlines. So far as we know, this Court has never had the occasion to

decide when modification is required, under Md. Rule 2-504(c), in order "to prevent injustice." But in appeals challenging the striking or admission of witnesses and other discoverable evidence untimely designated or disclosed, we have made clear that even if scheduling-order deadlines are not "unyieldingly rigid," *Naughton*, 114 Md. App. at 653, they should not be complaisantly lax either. We have held that circuit courts should demand "at least substantial compliance, or, *at the barest minimum*, a good faith and earnest effort toward compliance" with the scheduling order's requirements. *Id.* at 653 (emphasis in original). And we have held that parties should not be able to deviate from a scheduling order's deadlines without establishing good cause for their failure to comply with the dates originally set. *Faith v. Keefer*, 127 Md. App. 706, 733 (1999). To permit parties to shirk scheduling-order deadlines without substantial compliance and good cause for the modification requested would be, "on its face, prejudicial and fundamentally unfair to opposing parties" and would "decreas[e] the value of scheduling orders to the paper upon which they are printed." *Id.* (quoting *Naughton*, 114 Md. App. at 654). Only when substantial compliance and good cause have been shown by the party unable to meet the scheduling order's deadlines does modification "prevent injustice." Md. Rule 2-504(c).[4]

---

[4] These dual requirements for modification—substantial compliance and good cause— were reflected in the language of the scheduling order at issue in this case. By its terms, the order was modifiable "only upon a written motion . . . setting forth a showing of *good cause* that the schedule cannot reasonably be met despite the *diligence* of the parties seeking modification."(Emphasis added.)

It is unsurprising that these preconditions for the modification of scheduling orders under Md. Rule 2-504(c) would be drawn from appeals challenging decisions to strike or admit witnesses and other evidence for untimely designations or disclosures. This is because there is no substantive difference between a decision to modify (or adhere to) scheduling-order deadlines and a decision to admit (or strike) witnesses and other evidence designated or disclosed too late. Both are decisions to accommodate (or not) a party's failure to meet the discovery deadlines originally fixed by the circuit court. *Cf. Shelton v. Kirson*, 119 Md. App. 325, 333 (1998) (describing the preclusion of testimony from a late-designated witness as "declining to tolerate the gross departure by the appellant from the discovery schedule"). Permitting a party to rely on a witness untimely designated is a de facto modification of the scheduling order. Denying a motion to modify scheduling-order deadlines effectively precludes the party seeking modification from relying on the evidence untimely disclosed. *See Helman*, 138 Md. App. at 45 (suggesting that a late-filed expert's report "had already been effectively excluded by the denial of [the] appellant's . . . motion to extend" the scheduling-order discovery deadline); *Naughton*, 114 Md. App. at 647, 654 (explaining, in a case in which no party requested an extension of the deadline for expert-witness designation, that the circuit court did not err in *striking the testimony of an expert witness* because "[t]he record is . . . *devoid of good cause which might warrant modification*" of the scheduling order (emphasis added)); *cf. Berry v. Department of Human Resources*, 88 Md. App. 461, 467–68 (1991) (explaining that accepting an

amended complaint filed beyond a scheduling-order deadline would essentially require a revision of the scheduling order).[5]

Given this functional equivalence, it is also unsurprising that the considerations involved in granting or denying motions to strike witnesses and other evidence as a sanction for scheduling-order and discovery violations echo the considerations surrounding scheduling-order modification. Trial judges are "entrusted with a large measure of discretion in applying sanctions for failure to comply with the rules relating to discovery." *Heineman v. Bright*, 124 Md. App. 1, 7 (1998) (cleaned up). In *Taliaferro v. State*, 295 Md. 376, 390 (1983), Judge Lawrence F. Rodowsky wrote that the sound exercise of that discretion turns "on the facts of the particular case." *Id.* at 390. He continued:

> Principal among the relevant factors . . . are whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. Frequently these factors overlap. They do not lend themselves to a compartmental analysis.

---

[5] This reality is reflected in the arguments made to this Court. In his brief, Asmussen maintained that "the trial court's *refusal to extend the scheduling order* to permit Dr. Dahlgren and Dr. Runz to be deposed and/or submit reports supplementing the Expert Witness Designation . . . *operated as a case-ending sanction* . . . ." In other words, the decision to stick to the scheduling-order deadlines, in effect, would preclude him from using testimony from some of his expert witnesses.

The circuit court understood the relationship between these concepts in much the same way. After "weighing all of the factors," Judge Fletcher-Hill denied the motion to modify the scheduling order and granted the motions to strike Drs. Runz and Dahlgren concurrently. To decide one motion was, it appears, to decide the other.

*Id.* at 390–91.[6]

In many cases, two broader inquiries lie at the heart of the *Taliaferro* factors. First, has the party seeking to have the evidence admitted *substantially complied* with the scheduling order? This is increasingly less likely the later the disclosure and the less "technical" the violation at issue.[7] Second, is there *good cause* to excuse the failure to comply with the order? This is more likely when the party seeking an accommodation has a good reason for noncompliance, where the prejudice he suffers from non-admission is great, and where the prejudice his opponent suffers from admission is less severe.[8] *Cf. Helman*, 138 Md. App.

---

[6] *See also Maddox*, 174 Md. App. at 505 (holding trial court erred in striking an expert, whose report had been given to defendants a month late, because the court failed to "t[ake] into consideration *any factors* such as those identified in *Taliaferro*" (emphasis added)); *Helman*, 138 Md. App. at 43–47 (applying *Taliaferro* factors in evaluating circuit court's decision to strike a late-filed expert report); *Faith*, 127 Md. App. 706 (applying *Taliaferro* factors in evaluating circuit court's denial of a motion to exclude late-filed interrogatory answers); *Shelton*, 119 Md. App. 325 (applying the *Taliaferro* factors in evaluating circuit court's decision to preclude the testimony of a late-designated witness).

[7] The *Taliaferro* Court's discussion of *State v. Silva*, 374 A.2d 106 (R.I. 1977), provides an example of this substantial-compliance synthesis. In *Silva*, the *Taliaferro* Court explained, a criminal defendant filed a notice of alibi defense ten days late but six months before trial. *Taliaferro*, 295 Md. at 391. Five weeks before trial, the defendant supplemented this notice with an additional witness's name but without an address. *Id.* Notwithstanding the fact that the notice was provided late and in a "technically defective form," the *Silva* court concluded that "there was *substantial compliance* with the letter and spirit of the rule." *Id.* (emphasis added).

[8] For an example of this good-cause synthesis, see *Livingstone v. Greater Washington Anesthesiology & Pain Consultants, P.C.*, 187 Md. App. 346 (2009). There, this Court found that a plaintiff lacked "*good cause*" for requesting to name a second anesthesiology expert two months after the scheduling-order deadline because (1) he offered no reason for his failure to earlier designate the expert and (2) he did not explain how he would be

at 47 (analyzing a circuit court's decision to exclude a late-filed expert's report in light of the *Taliaferro* factors and concluding ultimately that the court did not abuse its discretion because the appellant could not show "*good faith compliance*" with the scheduling order and because he "failed to show *good cause* for his delay in completing discovery" (emphasis added)).

Both decisions—whether to modify a scheduling order and whether to strike a witness for a failure to comply with a scheduling order—are committed to the circuit court's discretion. *See Admiral Mortgage, Inc. v. Cooper*, 357 Md. 533 (2000) ("[T]he appropriate sanction for a discovery or scheduling order violation is largely discretionary with the trial court."); *cf. Eagle–Picher Industries, Inc. v. Balbos*, 84 Md. App. 10, 26 (1990) (explaining that the rule allowing trial court to modify a pretrial order "to prevent manifest injustice," then Md. Rule 2-504(c) but now under Md. Rule 2-504.2(c), "reposes in the trial judge a great deal of discretion"). Accordingly, we will reverse decisions to modify a scheduling order (or not) and decisions to strike witnesses for failure to comply with scheduling-order deadlines (or not) only if the circuit court's discretion has been abused. *See Livingstone v. Greater Washington Anethesiology & Pain Consultants, P.C.*, 187 Md. App. 346, 388 (2009) ("A trial court's discretionary rulings will be disturbed only upon a finding of an abuse of discretion.").

---

prejudiced without the testimony from the late-designated witness. *Id.* at 390–91 (emphasis added).

This means that to reverse the circuit court's decisions to deny Asmussen's motion to modify in this case and to grant CSX's motion to strike Dr. Dahlgren, we must conclude that "no reasonable person would take the view adopted by the [circuit] court," that the court acted "without reference to any guiding principles," or that the court's ruling "is violative of fact and logic." *Id.* (cleaned up). Additionally, we may reverse the circuit court if "we are unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the *exercise* of discretion." *Id.* at 389 (emphasis in original) (quoting *Maddox*, 174 Md. App. at 502). The judge must do more than "simply apply some predetermined position." *Id.* (quoting *Maddox*, 174 Md. App. at 502); *cf. Taliaferro*, 295 Md. at 390 ("The exercise of discretion contemplates that the trial court will ordinarily analyze the facts and not act . . . simply on the basis of a violation disclosed by the file."); *Hossainkhail v. Gebrehiwot*, 143 Md. App. 716, 724 (2002) ("Discretion signifies choice.").

Under the facts of this case—and limiting our analysis to Dr. Dahlgren—the circuit court did not abuse its discretion in declining to accommodate Asmussen's failure to meet the discovery deadlines set out in the scheduling order. For reasons that we explain below, the circuit court reasonably concluded that Asmussen had not substantially complied with the scheduling order, and that his failure to meet the disclosure deadline was not justified by good cause.

*1. Substantial compliance (*Taliaferro *factors: the timing of the ultimate disclosure and whether the disclosure violation was technical or substantial)*

Although Asmussen timely told CSX whom he intended to call as expert witnesses, his October 10, 2018, designation revealed nothing about the expected subject matter of the experts' testimony. With vague boilerplate language, he notified CSX only that

> "*[o]ne or more* of [his] experts *may offer* their opinions about the cause, diagnosis, prognosis and permanency of, and the treatment rendered for, any injuries [suffered by Asmussen] and the reasonableness and necessity of the medical treatment received and the damages incurred as a result thereof" and that the opinions of each expert would be based on "training, knowledge, expertise, experience, pleadings, discovery responses, medical records, testimony and any other information available." (Emphasis added.)

In other words, Asmussen did nothing more with his expert-witness designation than inform CSX that he might use experts to establish essential elements of his claim and that any testimony ultimately used would have some proper basis.

The amended designations provided on November 8 were more helpful to CSX—but just barely. They conveyed the *general subject matter* of the witnesses' testimony, identifying Drs. Regna and Dahlgren as causation witnesses and Dr. Runz as a treating physician. But the amended designations did not convey *the substance* of the causation experts' findings or opinions. They informed CSX that Drs. Regna and Dahlgren would link Asmussen's kidney cancer to "exposure to *one or more* [t]oxic [a]gents," but the precise toxic agent had yet to be identified. (Emphasis added.) In reality, when Asmussen amended his expert-witness designation, Drs. Regna and Dahlgren had not made any findings or formulated any opinions at all.

- 25 -

It wasn't until more than six weeks after the close of all discovery—and more than six *months* after the deadline for expert-witness designations—that Dr. Dahlgren's findings and opinions were made available to CSX, via a report included with Asmussen's memorandum contesting CSX's motion for summary judgment. Only at this point did Asmussen satisfy the substantive requirements of Md. Rule 2-402(g) with respect to Dr. Dahlgren.

Even if the October 2018 designation of Dr. Dahlgren had complied with Md. Rule 2-402(g), Asmussen withdrew that designation without reservation on January 22, 2019. The decision to put Dr. Dahlgren back on the list of plaintiff's experts was made on February 28, almost five months beyond the deadline for designations and less than two weeks before the close of all discovery.[9]

Under either view, the designation of Dr. Dahlgren was made well beyond the scheduling-order deadline. And this late disclosure was more than a technical violation of the scheduling order and the discovery rules incorporated therein. Because it had no information regarding the substance of Dr. Dahlgren's expert opinions and the bases for them until six weeks after the close of discovery, CSX could not effectively depose Dr.

---

[9] Asmussen suggests in his brief that the circuit court was incorrect to view his reversal on Dr. Dahlgren's withdrawal as a revival the doctor's earlier designation and not, as the circuit court saw it, a "new designation" days before the close of discovery. He develops no argument with respect to this point, and so we will not address it. *See* Md. Rule 8-504(a)(5) (providing that a brief must contain "[a]rgument in support of the party's position on each issue").

Dahlgren within the discovery period and was thus "deprived . . . of the ability to mount a defense to the case." *Helman*, 138 Md. App. at 44.

Based on the above, the circuit court could reasonably conclude that Asmussen had not substantially complied with the scheduling order.

*2. Good cause (*Taliaferro *factors: the reason, if any, for the violation and the degree of prejudice to the parties)*

If the scheduling order had been modified to permit this late-in-the-game designation, CSX would have been severely prejudiced as a result. Before Asmussen added (or re-added) Dr. Dahlgren to his list of expert witnesses, the railroad had already invested its resources in refuting the testimony of Dr. Regna and his theory that exposure to silica dust had caused Asmussen's cancer. A late designation of Dr. Dahlgren threatened to spoil the fruit borne by these efforts, giving Asmussen a do-over that would have expanded his theory of causation to include two additional toxic agents (creosote and diesel fumes) six weeks after the close of discovery and just three-and-a-half months before trial. As the circuit court noted, fairness likely would have required an extension of the discovery period so that CSX could effectively mount a defense. *Cf. Lowery v. Smithburg Emergency Medical Services*, 173 Md. App. 662, 676 (2007) ("The delay in obtaining the expert report did not allow appellees sufficient time to prepare their defense and was therefore prejudicial."); *Hossainkhail*, 143 Md. App. at 727 ("The purpose of discovery is to eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind, concerning the facts that gave rise to the litigation."

- 27 -

(cleaned up)). And while that extension would have allowed CSX to better defend itself, it also would have threatened a delay of the trial date, causing more prejudice to CSX. *See Hossainkhail*, 143 Md. App. at 728 ("There is inherent prejudice in delaying a trial. The passage of time can cause memories of witnesses to become obscured and can increase the likelihood that witnesses cannot be located." (cleaned up)).

Obviously, Asmussen was prejudiced by the non-accommodation of Dr. Dahlgren's late designation. As we discuss in the next section of our analysis, the decisions to not modify the scheduling-order deadlines and to strike Dr. Dahlgren as a result operated, in effect, as a case-ending sanction, leaving Asmussen without a witness able to establish causation. Asmussen correctly points out in his brief that "the more draconian sanctions [for scheduling-order violations, like] precluding the evidence necessary to support a claim, are normally reserved for persistent and deliberate violations that actually cause some prejudice." *Butler v. S & S P'ship*, 435 Md. 635, 650 (2013) (quoting *Admiral Mortgage, Inc.*, 357 Md. at 545); *see also Maddox*, 174 Md. App. at 507 (suggesting that "the imposition of a sanction that precludes a material witness from testifying, and, consequently, effectively dismisses a potentially meritorious claim without a trial, should be reserved for egregious violations of the court's scheduling order, and should be supported by evidence of willful or contemptuous or otherwise opprobrious behavior on the part of the party or counsel"). While the sanction here was harsh, the need to switch experts just days before the close of discovery resulted from an indefensible lack of diligence on the part of Asmussen's counsel.

Asmussen's counsel offered to the circuit court no explanation as to why Dr. Regna's deficient "background, education, training, and experience" would not have been "revealed" to him before the doctor's February 22 deposition. A cursory review of Dr. Regna's *curriculum vitae* would have revealed, months before, that Dr. Regna was not a certified toxicologist; that he had never authored a peer-reviewed toxicology article; that he was not a board-certified physician, an oncologist, an epidemiologist, or an industrial hygienist; and that he had performed no medical-toxicology work within the previous ten years. With a few simple questions, Asmussen's counsel would have learned that Dr. Regna had not done any research related to silica exposure and that Dr. Regna had never testified as an expert at trial. And if Asmussen's counsel had read the articles upon which Dr. Regna based his causation opinion, he would have known that none of these articles concluded there was a causal link between exposure to silica and kidney cancer.

Additionally, we note that in denying the motion to modify the scheduling order and granting the motion to strike Dr. Dahlgren, the circuit court was not striking Asmussen's only causation expert. Instead, the court was precluding Asmussen from adding an *additional* causation expert to his list after his earlier decision to rely exclusively on Dr. Regna proved to be a tactical misstep.

Based on the above, the circuit court could have reasonably concluded that Asmussen did not have good cause for his failure to meet the scheduling-order deadlines.

## B. The motion for summary judgment

Under Md. Rule 2-501(f), a motion for summary judgment should be granted if "there is no genuine dispute as to any material fact" and "the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). In determining whether these conditions are met, a court ruling on a motion for summary judgment must review the entire record, "drawing all reasonable inferences in favor of the party against whom summary judgment is sought." *Shastri Narayan Swaroop, Inc. v. Hart*, 158 Md. App. 63, 71 (2004).

While motions for summary judgment are valuable tools "to facilitate the efficient disposition of litigation," *Charles County Commissioners v. Johnson*, 393 Md. 248, 263 (2006), a summary judgment proceeding is not a substitute for trial, permitting a court to wrest from the jury "[e]videntiary matters, credibility issues, and material facts which are in dispute," *Boland v. Boland*, 423 Md. 296 (2011) (quoting *Frederick Rd. Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 93 (2000)). Rather, a motion for summary judgment is "a screening device," used by courts "to identify and end cases where there is *no need for a trial*." Joel Wm. Friedman & Michael G. Collins, *The Law of Civil Procedure* 580 (4th ed. 2013) (emphasis added); *see also United Services Automobile Ass'n v. Riley*, 393 Md. 55, 66–67 (2006) ("The function of a summary judgment proceeding is not to try the case or to attempt to resolve factual disputes but to determine whether there is a dispute as to material facts sufficient to provide an issue to be tried.").

In some cases, a trial may be unnecessary because the parties generally agree about the (material) facts and those facts are not susceptible to more than one inference; the parties require only a judicial assessment of the legal implications of the facts involved. *See Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016). In other cases, a trial may be unnecessary because one party lacks the proof that would be needed to establish an essential element of his case to a jury. As the Supreme Court explained in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986),

> In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Id.* at 322–23; *see also Central Truck Center, Inc. v. Central GMC, Inc.*, 194 Md. App. 375, 387 (2010).

In both scenarios, the court awards summary judgment because, based on the facts that *would be* admitted at trial, the evidence so "unmistakably favors one side" that no fair-minded jury could conclude to the contrary. *Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md. App. 236, 244 (1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)); *cf. Smithfield Packing Co. v. Evely*, 169 Md. App 578, 591–92 (2006) (discussing motions for judgment under Md. Rule 2-519, granted where the evidence *actually* admitted at trial would permit but one conclusion from the jurors).

- 31 -

The questions posed by a motion for summary judgment—whether there exists a genuine dispute of material fact and whether a party is entitled to judgment as a matter of law—are questions of law. *PaineWebber, Inc. v. East*, 363 Md. 408, 413 (2001). Accordingly, we review the circuit court's decision to grant summary judgment without deference, determining independently—on the record before the circuit court, viewed in the light most favorable to the non-moving party—"whether the parties generated a dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law." *Rowhouses, Inc. v. Smith*, 446 Md. 611, 631 (2016) (cleaned up). In conducting this *de novo* review, however, we ordinarily are limited to considering the grounds relied upon by the circuit court in granting summary judgment. *Sutton-Witherspoon v. S.A.F.E. Management, Inc.*, 240 Md. App. 214, 233 (2019).

In this case, it is clear that CSX was entitled to summary judgment in its favor. That is because, without Dr. Dahlgren, who was properly stricken from Asmussen's list of expert witnesses who would testify at trial, Asmussen had no witness able to establish the causal link between his kidney cancer and CSX's alleged negligence. Because causation is "an element essential to [Asmussen's] case, and on which [he would] bear the burden of proof at trial," *Celotex*, 447 U.S. at 317, CSX was entitled to judgment as a matter of law.

### C. Asmussen's other contentions

In ruling on CSX's motion for summary judgment, the circuit court concluded there were two independent bases for granting the motion. Not only did Asmussen lack an expert capable of establishing causation; he also needed an expert to establish the standard of care

allegedly breached by the railroad. On appeal, Asmussen contends that no standard-of-care expert was needed to establish that the railroad was negligent in exposing Asmussen to the silica dust, creosote, and diesel fumes that, he claims, caused his cancer.

The issue is not clear-cut. We have recently reiterated that "expert testimony is required 'when the subject of the inference [of negligence] is so particularly related to some science or profession that it is beyond the ken of average laymen.'" *Shutter v. CSX Transportation, Inc.*, 226 Md. App. 623, 642 (2016) (quoting *Hartford Accident and Indemnity Co. v. Scarlett Harbor Associates Ltd. P'ship*, 109 Md. App. 217, 257 (1996)). Often, "the 'business of operating a railroad entails technical and logistical problems with which the ordinary layman has had little or no experience." *Id.* at 643 (quoting *Bridger v. Union Railway Co.*, 355 F.2d 382, 389 (6th Cir. 1966)). Accordingly, an expert may be required to establish a railroad's negligence in assigning an employee work "beyond her physical capacity." *See id.* at 642 ("The standards that govern proper staffing and workplace safety for railroads simply are not something that ordinary people would know."). And an expert may be required to determine whether the design of a railroad crossing is too dangerous. *Bridger*, 355 F.2d at 389 ("It is absurd to contend that the average layman has, as a matter of common knowledge, a sufficient grasp of the diverse factors which must be considered in constructing and maintaining an acutely angled railroad crossing which will afford a maximum of safety and a minimum of inconvenience to vehicular traffic and train movement.").

Sometimes, however, the negligence alleged may fall *within* the ken of the average juror. For example, a jury may be able to conclude without the aid of expert testimony that a railroad has been negligent in failing to lay ballast, creating the muddy trackside conditions that cause an employee to slip and fall. *Szekeres v. CSX Transportation, Inc.*, 731 F.3d 592, 605 (6th Cir. 2013). In a case bearing some resemblance to Asmussen's, the Seventh Circuit concluded that no expert would be needed for a jury to find that a railroad was negligent in failing to provide adequate ventilation or proper equipment to employees tasked with cleaning boilers. *Harbin v. Burlington Northern Railroad Co.*, 921 F.2d 129, 131–32 (7th Cir. 1990) ("The jury is the tribunal to which is delegated the duty to apply the elusive concepts of reasonable care and cause and effect to the manifold facts and general circumstances of each individual case. A jury is as qualified to infer a general risk of harm to employees forced to labor without ventilation in a sooty environment as it is to infer the possibility of injury from a rusty wire left lying about, or a stagnant pool of water, or the lifting of a heavy weight." (cleaned up)).

Could a jury decide for itself that CSX was negligent in failing to provide Asmussen with additional protection against toxic agents like the silica contained in ballast dust? How is the answer to this question affected by the fact that the alleged negligence occurred decades ago? Was the railroad's conduct unreasonable *then*?[10]

---

[10] To these questions raised by the parties' briefs, we add another: Even if negligence could be found without the aid of an expert, could it reasonably be said that *kidney cancer* was a harm within the risks that made the railroad's conduct negligent? *See CSX*

- 34 -

In his appeal, Asmussen also contends that the circuit court erred in declining to accommodate a late deposition of Dr. Runz (by not extending the scheduling-order deadline for depositions and striking Dr. Runz as a result). He argues that his misrepresentations about Dr. Runz's availability for deposition did not violate the scheduling order or any of the discovery rules incorporated therein—the grounds that purportedly justified by circuit court's decision to strike Dr. Runz.

The Court of Appeals has held that "[s]hould a party fail, at any stage in the discovery process, to cooperate in providing access to discovery information, [Md.] Rule 2-433 provides that trial judges may issue . . . sanctions." *Rodriguez v. Clarke*, 400 Md. 39, 60 (2007). But, the Court said, "[s]anctions rarely come into play . . . when parties put forth good faith efforts to obtain and provide access to information needed to proceed to trial." *Id.* at 61. Even if there is no specific discovery requirement that a party make his expert available for deposition by the close of all discovery, good faith is "mandated by the Maryland discovery rules" and "is central to the entire discovery process." *Id.*

While the parties in this case clearly failed to depose Dr. Runz by the scheduling order's deadline for the completion of all discovery, and while it also appears that

---

*Transportation, Inc. v. McBride*, 564 U.S. 685, 703 (2011) ("Reasonable foreseeability of harm . . . is indeed an essential ingredient of FELA negligence. The jury, therefore, must be asked, initially: Did the carrier fail to observe that degree of care which people of ordinary prudence and sagacity would use under the same or similar circumstances? In that regard, the jury may be told that *the railroad's duties are measured by what is reasonably foreseeable under like circumstances*." (emphasis added) (cleaned up)).

Asmussen's counsel bears most (if not all) of the blame for this, did his conduct really amount to a violation of a specific discovery rule or the good-faith requirement discussed in *Rodriguez*?

These questions are interesting. But their answers lie at the end of analytical paths down which we need not travel. This is because we have held that the circuit court did not abuse its discretion in declining to accommodate Dr. Dahlgren's late designation. And without Dr. Dahlgren, Asmussen's claim could not survive CSX's motion for summary judgment—even if no standard-of-care expert was required and the circuit court did not strike Dr. Runz.

**THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS AFFIRMED. APPELLANT TO PAY COSTS.**